**1800 SMITH STREET ASSOCIATES, LP**

v.

**Louis A. GENCARELLI, Sr.**

**1500 Mineral Spring Associates, LP, by and through its partner Jason's Realty Corp.**

v.

**Louis A. Gencarelli, Sr.**

**Louis A. Gencarelli, Sr.**

v.

**1500 Mineral Spring Associates, LP et al.**

No. 2004–286–Appeal.

Supreme Court of Rhode Island.

Dec. 22, 2005.

Joseph V. Cavanagh, Jr., Providence, for Plaintiffs.

Robert D. Wieck, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

In this appeal the defendant, Louis A. Gencarelli, Sr. (defendant), the former leader of now bankrupt breakfast fixture, Bess Eaton Donuts & Flour Co. Inc. (Bess Eaton), laments a judgment of the Superior Court in favor of the plaintiffs—1800 Smith Street Associates, LP (SSA), 1500 Mineral Spring Associates, LP (MSA), and Jason's Realty Corp. (Jason's Realty) (collectively plaintiffs)—in three actions consolidated at trial.[1] The litigation below involved two separate lease agreements that the plaintiffs claim the defendant prematurely declared null and void. Finding in favor of the plaintiffs, the trial justice held, in relevant part, that: (1) time was not of the essence in the contracts; (2) the defendant waived all time limits in the lease agreements; and (3) the defendant acted in bad faith with regard to his conditional obligations under the lease agreements.

This case came before the Supreme Court for oral argument on September 26, 2005, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily

1. We have assigned the labels "plaintiff" and "defendant" to the parties here to simplify a somewhat complicated procedural posture. 1800 Smith Street Associates, LP (SSA) and 1500 Mineral Spring Associates, LP (MSA), by and through their common general partner, Jason's Realty Corp. (Jason's Realty), first brought suit against Louis A. Gencarelli, Sr. in the District Court for trespass and ejectment for nonpayment of rent in late March of 2000. In early April of 2000, Gencarelli sought a declaration of rights and duties against SSA, MSA and Jason's Realty in the Superior Court. On June 15, 2000, the District Court entered judgment in favor of both SSA and MSA, and Gencarelli appealed those judgments to the Superior Court. All three actions—Gencarelli's declaratory request and his two District Court appeals—were consolidated. Gencarelli appeals the decision of the Superior Court affirming the two District Court decisions, and finding against him in his declaratory suit. In his written opinion the Superior Court trial justice referred to Gencarelli as defendant, and SSA, MSA and Jason's Realty as plaintiffs based on their District Court posture. We will do the same on appeal.

be decided. After hearing the arguments and examining the record and the memoranda that the parties filed, we are of the opinion that this appeal may be decided at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment.

## I

### Facts and Travel

In 1998, when defendant first learned of the availability of the properties at 1500 Mineral Spring Avenue and 1800 Smith Street, both in North Providence, he was president and Chief Executive Officer of Bess Eaton. Tim Londregan, Bess Eaton's real estate agent, notified defendant of the sites on a tip from Sandra Salvadore (Salvadore), plaintiffs' real estate broker. SSA was then the record owner of the 1800 Smith Street property; MSA likewise owned the 1500 Mineral Spring Avenue property. The third plaintiff, Jason's Realty, was the general partner of both SSA and MSA; Bennie Sisto (Sisto) was, at all relevant times, the president and majority stockholder of Jason's Realty.

Negotiations ensued until both parties were satisfied that a demolition and construction deal could be brokered. The defendant planned to lease both parcels and, per his usual practice, then assign the leases to Bess Eaton, which then would construct doughnut shops on both sites.

On November 5, 1999, defendant signed, in his personal capacity, two separate lease agreements with nearly identical language covering both properties. Most relevant to this appeal, each lease contained the following conditions precedent:

"It shall be a condition precedent to the Lessee's performance of any obligation Lessee may have as Lessee hereunder that; (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; * * * (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution of this lease * * *."

In addition, each lease purported to become null and void upon the non-occurrence of any recited contingency:

"b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. *If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.*

"c. The Additional Rent Commencement Date shall be November 1, 1999 and shall be paid from said date through the duration of the lease. *If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void.*

"d. The Commencement Date of this Lease shall be November 1, 1999." (Emphases added.)

Thus, under the lease agreements, defendant was obligated to obtain all the neces-

sary town permits and approvals to run a drive-through coffee shop, and to obtain financing within 120 days after the effective date of the lease, or November 1, 1999. The plaintiffs, on the other hand, were required to submit to defendant environmental assessment reports prepared by an approved firm within sixty days of November 1, 1999. Under the terms of the leases, failure of any contingency would render the lease agreements null and void, and terminate all defendant's performance obligations under the lease.

The lease agreements were sent with cover letters addressed to Bennie Sisto, purporting to seek plaintiffs' assurances that they would be lenient with defendant's obligation to obtain town permits and approvals should he experience delays, court contests or appeals. Jason Sisto, then vice president of Jason's Realty and son of Bennie Sisto, executed the leases and separately signed the cover letters indicating that "[t]he content of [the] letter[s][was] acceptable on behalf of [plaintiffs] and [would] be deemed an amendment to the above referenced Land Lease[s]."

Peter Huff (Huff), director of development and construction for Bess Eaton, was appointed the on-site "point man" for the two building projects; he coordinated the work of construction personnel, engineers and attorneys, and was responsible for all construction details for the stores. Huff reported directly to defendant and advised him of any problems that arose in connection with the projects.

Soon after the lease agreements were executed, the parties exchanged several rounds of correspondence pertaining to various details of the agreements, mostly between Huff and Salvadore. Salvadore repeatedly contacted Huff to determine whether defendant had a particular environmental consultant with whom Bess Eaton or its lender preferred to conduct the required inspections. Huff never responded. In two letters dated December 20, 1999, Sisto informed defendant that SSA and MSA had selected Garofalo & Associates (Garofalo) as the environmental engineer for the projects. The defendant signed these letters, which represented an express acknowledgment that their content was acceptable and that their terms would amend the original lease agreements.

Eleven days after defendant executed the letters of amendment, on January 1, 2000, the sixty-day deadline for plaintiffs to furnish defendant with environmental reports passed without compliance. The defendant, however, later testified at trial that receiving the reports within the initial sixty-day period was not important to him. In addition, Bess Eaton apparently thought it would not have a problem obtaining financing without the environmental reports within those sixty days. Instead, defendant seemed to be under the impression that his success in getting financing turned on his ability to secure the requisite approvals from the Town of North Providence (town).

Sometime in late January, Salvadore, as plaintiffs' agent, set up a meeting between defendant, his son, Paul Gencarelli (Paul), and New England Realty Resources to discuss financing options. At the conclusion of this meeting, Paul informed Salvadore that Bess Eaton was all set with financing, and confirmed that sentiment in a letter dated January 31, 2000.

Garofalo began its environmental inspection of the 1500 Mineral Spring Avenue property on February 14, 2000. Upon completion of the Phase I report, Garofalo recommended a Phase II subsurface evaluation because of the former presence of a nearby gasoline station. Salvadore told Huff of Garofalo's recommendation, and Huff told her to proceed, further informing her that he had no interest in seeing the

completed Phase I report. When the Phase II evaluation was performed sometime between February 22 and February 24, 2000, Huff expressed his pleasure with the progress.[2]

As of February 16, 2000, Bess Eaton had not submitted the proper applications for permits and approvals to the town. The defendant and Bess Eaton's corporate counsel, Scott Spear, by correspondence dated February 16, 2000, instructed Salvadore to contact attorney Joe Ferrucci, who was hired by defendant to oversee the local permitting process. Pursuant to this instruction, Salvadore reserved a place on the North Providence Town Planning Board's February 22 agenda. Salvadore further informed Huff, Spear and Ferrucci that they would need to submit some sort of proposal to the planning board director. At the February 22 meeting, Huff made a presentation using informational packages prepared the previous summer during negotiations. Although his proposal was met with favor, a quorum of the board was not present to effect a vote, and the matter was continued to March 13, 2000, almost two weeks beyond expiration of the contractual 120–day financing contingency.

In two letters dated February 29, 2000, defendant informed plaintiffs that because he was unable to secure either the necessary permits or financing for the projects, and because plaintiffs failed to procure any environmental assessment reports, he was declaring the leases null and void according to their own terms. In nearly contemporaneous invoices—one dated February 29, 2000, and the other March 1, 2000— plaintiffs reminded defendant that his minimum base rent obligations would begin pursuant to the terms of the lease.

The parties subsequently entered into negotiations in an attempt to salvage the deal. It quickly became apparent, however, that defendant was dissatisfied with his contractual duty to pay rent before he had obtained the requisite permissions from the town and before construction of either shop had been completed. While plaintiffs were amenable to defendant's taking additional time to obtain the necessary town approvals, plaintiffs were not as receptive to defendant's postponing his rent obligation until the construction projects were complete.

MSA and SSA filed separate actions in the District Court on March 29, 2000, seeking unpaid rent from defendant. On April 6, 2000, defendant countered with a Superior Court action against all three plaintiffs, seeking a declaration that the leases were null and void and that defendant's performance obligations under both agreements had ceased. The District Court found in favor of MSA and SSA in June 2000, and defendant appealed for a *de novo* review of those separate decisions in the Superior Court. All three actions then were consolidated for a bench trial beginning on December 9, 2003.

In a written opinion issued on March 26, 2004, the trial justice found for plaintiffs. The trial justice first noted that time was not of the essence in the lease agreements. Second, the trial justice found that defendant waived all time limits in the contracts. Finally, the trial justice held that defendant, both by himself and through his agents, did not act with good faith and failed to do due diligence in completing his contractual obligations.

## II

### Analysis

On appeal defendant essentially raises three arguments. First, he contends that

---

**2.** A Phase II evaluation was performed on the 1800 Smith Street property. This evaluation was performed at roughly the same time as the Phase II evaluation on the 1500 Mineral Spring Avenue property.

the trial justice misinterpreted the unambiguous language of the two lease agreements. Second, defendant maintains that the trial justice's finding of waiver was unsupported, and thus the non-occurrence of the 120–day financing contingency rendered the lease agreements null and void per their own terms. Finally, he insists the trial justice's finding of bad faith and lack of due diligence was not supported by the evidence.

## A

### Contract Interpretation

■ The defendant first argues that the trial justice misinterpreted the plain language of the respective lease agreements. The trial justice found that there was "no explicit language in the leases themselves suggesting that these [60 and 120–day] time frames [were] material or essential to the agreements." The defendant retorts, however, that the plain language of the original leases clearly indicates that, in fact, both parties intended to be bound by a 120–day apocalyptic crux under which defendant automatically would be relieved of *all* his performance obligations upon the non-occurrence of either contingency.

■ "Contract interpretation is a question of law * * *." *Lajayi v. Fafiyebi*, 860 A.2d 680, 686 (R.I.2004) (quoting *Dubis v. East Greenwich Fire District*, 754 A.2d 98, 100 (R.I.2000)). This Court reviews questions of law *de novo*, and will not construe contractual provisions unless ambiguous. *Id.*; *A.F. Lusi Construction, Inc. v. Peerless Insurance Co.*, 847 A.2d 254, 258 (R.I.2004). When determining ambiguity, we "view the agreements in their entirety and give the contractual language its 'plain, ordinary and usual meaning.'" *Lajayi*, 860 A.2d at 686 (quoting *A.F. Lusi Construction, Inc.*, 847 A.2d at 258).

A review of the relevant portions of the lease agreements at issue reveals no ambiguity. An enumeration of the six operative conditions precedent in these agreements is preceded by the express qualification that they be treated as *conditions precedent*. Specifically, it is unambiguous that plaintiffs were obligated to provide defendant with an environmental assessment report for each property prepared by an approved firm within sixty days of lease execution, and that defendant was required to obtain 80 percent financing for his proposed construction projects within 120 days from lease execution. These observations, however, do not compel an uncompromising reading of these time constraints.

■ Although defendant is correct to point out that "clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions," *Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I.2002) (quoting *Burke v. Potter*, 771 A.2d 895, 895 (R.I.2001) (mem.)), the plain meaning of a time provision within a contract is not so severe: "[O]rdinarily contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that a breach of the time element will excuse nonperformance." *Lajayi*, 860 A.2d at 688; *see also Sal's Furniture Co. v. Peterson*, 86 R.I. 203, 208, 133 A.2d 770, 773 (1957). That is, explicit time limits "standing alone and without more do not indicate that the time[s] fixed for performance [are] intended by the parties to be a material or an essential part of their agreement." *Safeway System, Inc. v. Manuel Bros., Inc.*, 102 R.I. 136, 145–46, 228 A.2d 851, 856 (1967). This Court has elaborated thus:

"That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made. There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." *Id.* at 145, 228 A.2d at 856 (quoting *Sal's Furniture Co.,* 86 R.I. at 208, 133 A.2d at 773).

If that party is unable to satisfy his or her burden, then performance within a reasonable time of the contemplated date is sufficient. *See id.* at 146, 228 A.2d at 857.

This Court's rather pragmatic approach to contractual time limits loses no force simply because the temporal constraints involved in the instant appeal are contained within express conditions precedent. In fact, we have held that, in the absence of any contractual indication to the contrary, a performance condition would not be so rigidly construed. In *Safeway System, Inc.,* the parties had entered into a purchase and sale agreement to be consummated on a particular date. A separate clause automatically extended the closing date one month if the seller was unable to acquire and pay for the subject property, but in no event could the date be extended more than six months from the originally scheduled closing. *Safeway System, Inc.,* 102 R.I. at 138, 228 A.2d at 853. This Court held that, despite the unambiguous language of the condition, time was not made of the essence, and, therefore, the parties had not bargained for an unyielding construction of the time provision; a reasonable time after the six-month expiration would suffice for performance. *Id.* at 143–46, 228 A.2d at 855–57.

Our review of each agreement reveals no language indicating time was expressly made of the essence. Although we are pointed to the clauses declaring both leases null and void upon the failure of any contingency as an equivalent indication of intended punctuality, we agree with the trial justice's analysis on this point: Because of the relative frequency of "null and void" clauses in contracts, such a formulation would effectively render "time is of the essence" provisions futile. This Court refuses to upset "the indisputable right of parties to make time of the essence in their contracts." *Safeway System, Inc.,* 102 R.I. at 145, 228 A.2d at 856. Furthermore, the extensive negotiations between the parties in this case prior to execution only serve to highlight the absence of any indication that the time restrictions were intended to be given a "drop-dead" construction.

We also decline to hold that the trial justice erred in concluding that defendant did not satisfy his burden of proving that time was of the essence. Both at trial and now on appeal defendant points to the invoices sent by plaintiffs on February 29, 2000, to remind defendant of his rent obligation as evidence of plaintiffs' intention to be bound by the 120–day financing contingency. A review of the lease agreements unambiguously demonstrates that commencement of defendant's minimum base rent obligation was 120 days from lease execution. These same clauses also excuse defendant from performance and automatically declare both agreements null and void should defendant be unable to perform any of the recited contingencies. It is clear, however, that defendant's minimum base rent obligation is a wholly separate duty in each lease agreement, merely qualified by defendant's several other duties outlined within the various conditions precedent. We cannot agree that simply because the lease agreements for-

tuitously call for rent to begin on the same date that defendant was to have obtained financing, plaintiffs are somehow conceding a strict reading of the time limits within the conditions precedent. Our conclusion is only bolstered by the fact that defendant repeatedly assured plaintiffs he would not have a problem obtaining financing, and never once indicated before February 29, 2000, that he would be unwilling to perform under the agreements.

Furthermore, defendant's contention that the trial justice misinterpreted the 120–day time limit as no more absolute than the sixty-day reporting condition is without merit. The defendant argues that the plain, unambiguous language of the lease agreements compels the interpretation that all conditions precedent needed to be satisfied within 120 days from lease execution. If the conditions were not satisfied, defendant posits, the agreements required automatic nullification. As explained above, absent proof of party intent that time be of the essence in the lease agreements, the parties simply were required to satisfy their respective contingencies within a reasonable time under the circumstances; any failure to do so was not fatal, and did not automatically invoke the null and void clauses.

## B

### Waiver

The defendant also claims the trial justice committed clear error by finding that he waived the 120–day contingency due, in part, to defendant's conscious decision to continue with the lease agreements

after the sixty-day reporting contingency expired.[3] The defendant insists that plaintiffs' express recognition of February 29, 2000, as the rent commencement date—the 120th day from lease execution—unequivocally demonstrated plaintiffs' intent to be absolutely bound by the 120–day financing condition precedent.

"When reviewing findings of fact by a trial justice in a nonjury case, we apply a deferential standard of review." *McEntee v. Davis,* 861 A.2d 459, 462 (R.I. 2004) (quoting *Vigneaux v. Carriere,* 845 A.2d 304, 306 (R.I.2004)). This Court will refrain from disturbing a trial justice's ruling "[u]nless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *McFarland v. Brier,* 769 A.2d 605, 610 (R.I.2001) (quoting *Paradis v. Heritage Loan and Investment Co.,* 701 A.2d 812, 813 (R.I. 1997)).

This Court has held that "[w]aiver is the voluntary intentional relinquishment of a known right. It results from action or nonaction * * *." *Lajayi,* 860 A.2d at 687 (quoting *Haxton's of Riverside v. Windmill Realty, Inc.,* 488 A.2d 723, 725 (R.I.1985)). "[A] party may waive a condition precedent if the condition is for the benefit of the waiving party." *Thompson v. McCann,* 762 A.2d 432, 436 (R.I. 2000). In addition, "[a] party's actions can resolve the question of whether he or she has knowledge of the right waived and whether the waiver was voluntary. As a general rule, the question of whether a

3. To the extent defendant argues, if at all, that the trial justice erred in finding that defendant waived the sixty-day reporting contingency, his claim is without merit. Any suggestion that the trial justice erroneously overlooked the fact that plaintiffs believed their only obligation by sixty days after lease execution was to have *selected* an environmental engineer completely ignores the actual basis for the trial justice's finding of waiver: that defendant "voluntarily continued with contracts long after the sixty-day time limit had not been met."

party has voluntarily relinquished a known right is one of fact * * *." *Haxton's of Riverside, Inc.*, 488 A.2d at 725–26.

Recently, in *Fracassa v. Doris*, 876 A.2d 506 (R.I.2005), this Court had occasion to entertain a similar set of facts. In that case, two parties entered into a purchase and sales agreement containing a condition requiring the buyer to obtain a mortgage commitment letter no later than ten days before the scheduled closing date. *Id.* at 507, 508 n. 1. The buyer failed to satisfy the contingency, but the parties continued to negotiate beyond the closing date, and orally agreed to a second date for consummation. *Id.* at 508. The seller eventually sold the property to a third party, and the buyer sued for specific performance. *Id.* We upheld the trial justice's ruling that the parties' continued negotiations beyond the closing date effectively waived the mortgage commitment contingency in the original purchase and sales agreement. *Id.* at 510.

In light of *Fracassa*, we are convinced that the trial justice was presented with ample evidence to support a finding that defendant, a party to benefit from the 120–day contingency, had the power to, and did, in fact, waive the 120–day financing condition precedent. Following defendant's renunciation of the lease agreements in his February 29, 2000, letters to plaintiffs, both parties continued negotiations in an attempt to save the deal. Despite the unfruitful outcome of these talks, the mere occasion of continued deliberations with a mind toward reviving anything akin to the original agreements places this case squarely within our holding in *Fracassa*.

In addition, we are not convinced that the facts presented do not support the trial justice's conclusion that defendant knew of and voluntarily waived the 120–day financing contingency with his own actions and/or inaction. First, in cover letters dated November 4, 2000—three days after the effective date of the lease agreements—defendant sought express assurances that plaintiffs would not strictly enforce the operating permit conditions precedent contained within the same section of both lease agreements. The defendant also agreed in writing to plaintiffs' selection of an environmental reporting firm a mere twelve days before expiration of the sixty-day environmental reporting contingency. In addition, defendant's agent, Huff, expressed his pleasure with the progress of the environmental inspections just four days before the 120–day financing contingency expired—some fifty-plus days after cessation of the sixty-day condition precedent. Similarly, defendant not only testified that receipt of the environmental reports within the sixty-day contingency was unimportant to him, but also he turned down a financing offer from New England Realty Resources, and he himself represented that he would not have difficulty obtaining financing without the environmental reports he now asserts were so essential to timely satisfaction of the financing condition precedent.

 We are satisfied that the trial justice committed no reversible error with respect to his conclusion that defendant waived the 120–day financing condition precedent.[4]

---

4. Although we hold in this case that there was an adequate basis in the record for a finding that the provisions in the contract relating to time were waived, we wish to emphasize that waiver of contractual provisions is not lightly to be inferred. Were it otherwise, contracts inevitably would come to be viewed as "little more than scraps of paper." *D'Antuono v. CCH Computax Systems, Inc.*, 570 F.Supp. 708, 714 (D.R.I.1983) (Selya, J.).

The party claiming that there has been a waiver of a contractual provision has the bur-

## C
## Bad Faith

 Finally, defendant insists that the trial justice misconceived the evidence presented at trial in concluding that he acted without good faith. We find it noteworthy that perhaps the most salient theme permeating both plaintiffs' counter arguments on appeal, and indeed the trial justice's ruling below, is bad faith: that defendant acted without sufficient regard for his implied legal duty to pursue his contractual obligations with the requisite degree of good faith and due diligence. The defendant maintains that plaintiffs presented insufficient evidence for the trial justice to conclude that defendant acted in bad faith with regard to the 120–day financing contingency.

 "It is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about that happening." *Bradford Dyeing Association Inc. v. J. Stog Tech GmbH*, 765 A.2d 1226, 1237 (R.I.2001). "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *Id.* (quoting *United States v. Croft–Mullins Electric Co.*, 333 F.2d 772, 775 n. 4 (5th Cir.1964)). We also have

noted that should "one party to the contract prevent[ ] the happening or performance of a condition precedent that is part of the contract, that action eliminates the condition precedent." *Id.* at 1238.

We recently considered a party's duty of good faith in a context similar to the transaction at issue here. *Lajayi,* 860 A.2d at 683, involved a land sale contract with a mutually beneficial mortgage contingency clause. The contract was to automatically become null and void upon the non-occurrence of any contingency contained therein. *Id.* We held that "[t]he duty of good faith and fair dealing, implied in every contract," *id.* at 687, requires some form of notice before a party to that contract can cancel the agreement:

> "the only way the agreement can be interpreted as a rational instrument * * * is to recognize, even in the absence of a formal notice requirement, an implicit requirement that, to bring into play the 'null and void' provision, one party communicate to the other some form of notice." *Id.* (quoting *Tremouliaris v. Pina,* 23 Mass.App.Ct. 722, 505 N.E.2d 225, 227 (1987)).

The record supports the trial justice's finding that defendant acted with bad faith in fulfilling his conditions within 120 days from lease execution. The defendant testified at trial he was less than pleased that the leases required him to begin paying rent before he obtained all necessary permits. This sentiment is supported by defendant's concession in his deposition that he had no knowledge of any such obligation when he signed the agreements.

---

den of proof on that issue. *See* 28 Am. Jur. 2d *Estoppel and Waiver* § 225 (2000) ("The party claiming a waiver has the burden of proof of the facts on which the party relies to establish such waiver, and unless such proof is forthcoming the party cannot sustain the claim."). And the evidence supporting an

inference of waiver must be clear. *See id.; see also Fencl v. City of Harpers Ferry,* 620 N.W.2d 808, 816 (Iowa 2000); ·*Motor Vehicle Board of the Texas Department of Transportation v. El Paso Independent Automobile Dealers Association, Inc.,* 1 S.W.3d 108, 111 (Tex. 1999).

And defendant's reservations about the lease agreements explain the motivation behind his procrastination with regard to the town permits. It was February 16, 2000, before defendant's counsel had filed the necessary applications with the town, and it was only because of plaintiffs' efforts that the matter was placed on the town's agenda on February 22, 2000—a mere seven days before the 120–day financing contingency expired.

We also find it troubling that defendant never attempted to notify plaintiffs that he intended to enforce stringently any condition precedent. Specifically defendant did not notify plaintiffs that the 120–day contingency would be enforced strictly despite the fact that they agreed not to enforce the sixty-day contingency. In fact, Salvadore testified that Huff expressed his satisfaction at the inspection progress just four days before the *120–day* contingency expired.

Furthermore, defendant apparently went out of his way to give plaintiffs the impression he was willing and able to proceed with the deal. Bess Eaton was offered financing on both the Smith Street and Mineral Spring Avenue properties by New England Realty Resources, financing which defendant refused by letter dated January 31, 2000, just a month before the 120–day contingency was scheduled to expire.

 The defendant's actions, including his failure to notify plaintiffs that he intended to strictly enforce the 120–day contingency, prove fatal. When the end result ultimately would invoke a null and void provision, even in the absence of a formal notice requirement, the duty of good faith imposes an implicit requirement that one party communicate to the other some form of notice. *Lajayi*, 860 A.2d at 687. Without such notice, defendant could not equitably seek a strict construction of that time constraint.

Viewing the evidence in its entirety and with appropriate deference to the trial justice, we cannot say that any error was committed below concerning the trial justice's bad faith charge.

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.