DECISION
In this civil action, Plaintiff, Andrew J. Matteo, (hereinafter referred to as Matteo or Plaintiff), asks this Court to order Defendant, Apponaug Mini Storage, Inc., (hereinafter referred to as Apponaug or Defendant), to specifically perform a Purchase and Sale Agreement, (hereinafter referred to as PS or PS Agreement), conveying the Defendant's real estate and business located in Warwick, Rhode Island, to him, along with damages for the expenses he has incurred in attempting to complete the Agreement.
Apponaug counterclaims seeking a declaratory judgment which would declare the agreement null and void and of no effect; an order to have the Plaintiff remove the lien he placed on Defendant's property along with compensatory and punitive damages as well as attorney's fees.
In a trial conducted over four days, the Court heard the testimony of witnesses for both sides, admitted numerous exhibits into evidence, accepted pre and post-trial memoranda and post-trial proposed findings of fact and conclusions of law.
 FACTS AND TRAVEL
The following is an overview of the facts in this case. Other facts will be added as deemed necessary by the Court.
In the fall of 1998, Matteo began negotiations to purchase the real estate and business of Apponaug Mini Storage, Inc., a mini storage facility located in Warwick. The Rhode Island Corporation was solely owned by Kevin Kernan, (hereinafter referred to as Kernan). Plaintiff's dealings were with John Dickson, (hereinafter referred to as Dickson), a real estate agent representing Apponaug. Plaintiff and Dickson agreed to a $375,000 purchase price. Plaintiff then had his attorney, Paul Gray, (hereinafter referred to as Gray), begin the necessary paperwork. At the same time, Matteo had his banker, Manuel Vales, (hereinafter referred to as Vales), of Bank of Boston begin the financing process. As a first step, in late 1998, Vales ordered an appraisal of the real estate. Gray prepared a commercial PS Agreement which he forwarded to Apponaug's attorney, Mark Charleson, (hereinafter referred to as Charleson), calling for a contract price of $375,000 with a $15,000 deposit and $360,000 due at the closing. Gray was named as escrow agent for the deposit at Matteo's request. Kernan signed the PS Agreement on behalf of Apponaug and on January 7th, 1999, Charleson mailed it to Gray with a cover letter that said, in part:
 "This document is being sent to you in escrow and will be considered null and void unless I receive acknowledgement from you within seven days that you have received and deposited the deposit checks."
On January 14, 1999, Gray wrote to Charleson,
 "I am enclosing a copy of my client's company check in the amount of $14,500 as the balance of the deposit on the real estate being purchased from Apponaug Mini Storage. John Dickson, of Abbott Properties, is forwarding to me the $500 that my client gave him when he submitted the offer on the property. When I receive the check from Mr. Dickson, I will forward a copy to you."
Only at Gray's deposition in November 2005 did he reveal, for the first time, that the checks were not deposited in his escrow account. At the trial, Gray and Matteo pointed the finger at each other as to who directed that the checks not be deposited. The PS Agreement called for a closing on February 28th, 1999, with financing and environmental conditions being met by January 31, 1999. It also called for the Plaintiff's reviewing certified financial statements, the past two years of signed tax returns, and other books and records of the Defendant. On January 14, 1999, Gray sought an extension for financing to March 1, 1999, with a closing on March 31, 1999. Charleson returned the executed amendment on January 22, 1999. However, on January 29, 1999, because his client was out of town and had not signed the extension amendment, Gray sent Defendant a notice of termination because financing had not been obtained by January 31, 1999. On February 4, 1999, Gray sent the executed amendment back to Charleson requesting Vales' need to review two years of signed tax returns along with income and expense reports for the last year.[1]
After a second request for financials in mid-February, Gray again sent a letter of termination to Charleson on February 26, 1999, (the first extension had a mortgage contingency of March 1, 1999) along with a request for a second extension of the agreement for an additional 30 days. On March 5, 1999, Charleson responded, "I do not think my client is inclined to sign another extension." And in fact, Kernan never signed the extension. After some back and forth correspondence between the attorneys regarding the Defendant's financials and Plaintiff's attempts to obtain financing, Charleson wrote to Gray on March 31 stating, "Kevin Kernan is willing to extend the closing date only until April 7, 1999." On April 9th, Bank of Boston made a handwritten loan approval to the Plaintiff and gave a commitment letter on April 23 with Plaintiff signing it on April 29.[2]
In between these dates, on April 17, Charleson wrote Gray stating that because of Plaintiff's inability to close, Gray was authorized to return the deposit upon Plaintiff's signing an appropriate release. Although Gray tried to set up a closing sometime in May, Charleson made it clear by his letter of May 3 that his client would not close because Plaintiff failed to close in a timely manner and because Gray, on February 26, had terminated the agreement on behalf of his client.
On May 19, Plaintiff went to a "closing" with his attorney and the closing attorney. Defendant did not appear.[3]
With no closing, the first phase of this action was commenced with Plaintiff filing his Lis Pendens Notice against Defendant's real estate.
 ARGUMENTS OF THE PARTIES
Plaintiff argues,
(1) That the deposit of the two checks totaling $15,000 was not a condition precedent to the creation of the contract and is of no consequence since there were other promises between the parties to establish the necessary consideration to create a binding agreement.
(2) That since time was not of the essence, the delay in closing beyond March 31 (or April 7, Kernan's agreed extension) to May 19th was reasonable, especially since the Defendant delayed getting certified records to the Plaintiff as per the PS Agreement.
(3) That even if the Defendant's letter of extension to April 7 was a "drop dead date," that is equivalent to a time of the essence clause, it is meaningless based upon Supreme Court holdings that such clauses are not to be strictly enforced and that Charleson's continued correspondence with Gray after that date waived its enforceability by the Defendant.
(4) That Plaintiff is ready, willing and able to perform and is entitled to specific performance of the PS Agreement along with damages for expenses incurred attempting to gain the property.[4]
The Defendant argues,
(1) That based on the clear intent of the parties, a $15,000 deposit was to be deposited and negotiated in an escrow account with Gray as the escrow agent for both parties. This requirement was a condition precedent to the enforceability of the PS Agreement and since it was never met, there was no contract between the parties.
(2) That because the Plaintiff and/or Gray did not reveal the checks had not been deposited, and because of Matteo's instruction to Gray not to deposit the checks, Plaintiff is guilty of unclean hands precluding him from the equitable remedy of specific performance which must be proven by clear and convincing evidence.
(3) That Charleson's letter setting a final closing date of April 7th was a "drop dead date" creating a time of the essence condition that was not reasonably complied with since there was no closing proposed until well into May.
(4) That Gray's letter of February 26 was a termination of the agreement ending any further responsibility by the Defendant.
(5) That the provision in the PS Agreement referring to "the closing" and a 30-day extension only applies to the attorney for the buyer being unable to close and there was no evidence that buyer's attorney at any time exercised this provision or had a reason to do so.
(6) That while Orlando Ciccone, (hereinafter referred to as Cicccone), the prospective second mortgagee, spoke in general terms about secondary financing, even at the end of May there was no definite agreement between him, the Plaintiff and the bank as to its terms, so that Plaintiff was not ready, willing and able to close in May 1999.
 ANALYSIS THE DEPOSIT CHECKS
There is authority for the position that a contract may be enforceable even when the deposit checks are late, dishonored or where the checks were never deposited because consideration may exist based upon other promises between the parties. This is not so, however, when the depositing of the checks is so material to the complete agreement that it constitutes a condition precedent which, when not complied with, prevents the agreement from ever becoming a binding contract.
In reviewing the negotiations between the parties and their attorneys, it is apparent that Apponaug's expectation that the checks would be deposited was material to the complete agreement. On January 7, Charleson wrote to Gray, "This document, (the executed purchase and sales agreement), is being sent to you in escrow and will be considered null and void unless I receive acknowledgment from you within seven days that you have received and deposited, (emphasis added), the "deposit checks". In response, on January 14, Gray wrote to Charleson,
 "I am enclosing a copy of my client's company check in the amount of $14,500 as the balance of the deposit on the real estate being purchased from Apponaug Mini Storage. John Dickson, of Abbott Properties, is forwarding to me the $500 that my client gave him when he submitted the offer on the property. When I receive the check from Mr. Dickson, I will forward a copy to you."
In addition, on January 8, Gray wrote to Dickson,
 "I will keep the original purchase and sale agreement in escrow until the deposit is paid." (emphasis added).
What made this deposit so important to the Defendant was that while normally it or its attorney would have held the checks as escrow agent, here Plaintiff's attorney was doing so. As Charleson testified, he consented to this only because he recollected Plaintiff's concern that a stranger would be holding the money in escrow. What he failed to realize was that Plaintiff had other reasons for this request. As Gray testified, Plaintiff instructed him not to deposit and negotiate the checks in a bank account, thus allowing Plaintiff the liquidity of these funds while he contemplated the agreement.[5]
As both sides acknowledge, once the deposit is so material to the complete agreement that it constitutes a condition precedent, then failure to comply precludes the creation of a binding contract and, without one, defeats the Plaintiff's right to specific performance as well as compensatory damages.
 THE ESCROW AGENT
Although unusual, Gray was made the escrow agent for the two checks and, as such, owed a fiduciary duty to both parties. Matteo and Gray have admitted at trial that Gray failed to deposit the checks into his escrow account. Plaintiff instructed Gray not to do it. Yet, Gray never informed Charleson or anyone else involved with this transaction of this fact until his deposition in 2005. Rather, in response to Charleson's letter of January 7, he gave the clear impression that not only did he have the Plaintiff's checks, but also that, as per Charleson's direction, he would deposit them into his escrow account. This conduct was false and misleading. It is conduct equaling bad faith so that even if there were a valid contract, it prevents the ordering of specific performance, and in fact, breaches the "purchase price" clause of the PS Agreement requiring that the $15,000 deposit be "paid".[6]
 PLAINTIFF'S FAILURE TO PERFORM
Although the Court's analysis as to the deposit essentially resolves Plaintiff's claim, it will nevertheless address the remaining issues raised by the parties. The original PS Agreement did not include a time of the essence clause. The correspondence between the parties did, however, reveal the sellers intent that there be a closing by April 7 and that it would not sign the Plaintiff's second 30-day extension. In 1800Smith Street Associates, LP v. Louis A. Gencarelli, 888 A.2d 46
(R.I. 2005) the Court stated,
 "That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made."
However, it went on to point out that,
 "The extensive negotiations between the parties only served to highlight the absence of any indication that the time restrictions were intended to be given a `drop dead construction'."
Here, the opposite is true. Not only did Charleson indicate on March 5 that, "I do not think my client is inclined to sign another extension", but also, on March 31 wrote, "Kevin Kernan is willing to extend the closing date only until April 7, 1999." This is the "drop dead date" mentioned in 1800 Smith StreetAssociates. Despite this fact, and despite assurances that a closing was imminent, the earliest that a closing was scheduled by the Plaintiff was May 19th, long after Charleson had authorized the release of deposit on April 17, and after he reiterated on May 3 that his client would not close because of Plaintiff's failure to close in a timely manner.
The original PS Agreement set a closing date of February 28. By agreement, the parties extended it to March 31, and Defendant gave a drop dead date of April 7, to which Plaintiff, on April 9, anticipated a closing by the "end of the week." This Court believes time was now of the essence and a delay to May 19 was unreasonable, thus ending Defendant's obligation under the PS Agreement.
 PLAINTIFF'S TERMINATION OF THE PURCHASE AND SALES AGREEMENT
On February 26, Gray wrote to the Defendant and Charleson exercising his right to terminate because of failure to secure a mortgage. While this was purportedly done with the hope that Defendant would sign a second extension, it nevertheless served to end the agreement. Coupled with the Defendant's notice of refusal to sign the extension, along with the "drop dead date" of April 7th, this Court concludes that without some conduct by the Plaintiff to vacate the termination, it remained in effect and ended the Defendant's obligation under the PS Agreement. Nothing that Charleson did after March 31 would serve to negate the termination. Charleson repeatedly made clear that the PS Agreement was terminated because of the Plaintiff's failure to close. The fact that he may have continued to correspond with Gray was, as he said, no more than "an accommodation" to the Plaintiff in hopes he would close, but not to alter the Defendant's clear position that the agreement was terminated.
 NO SECONDARY FINANCING
Although Ciccone testified as to his general understanding regarding secondary financing for the Plaintiff, no evidence was presented by the Plaintiff to prove the specifics of this loan. In fact, even at the time of the proposed closing on May 19, no agreement had been made between the Plaintiff, Ciccone, and the bank as to the specifics of the second loan and the so-called "standstill agreement."
 NO CERTIFIED DOCUMENTS
Plaintiff's main argument throughout the trial has been that the Defendant's failure to provide the proper financial documents prevented him from getting the bank financing in time for the closing. In fact, Vales already had information regarding the Plaintiff from prior transactions with him, and had uncertified and unsigned information from the Defendant. When the certified documents were filed, they were, in every respect, the same as the original ones except for signatures. There was no evidence presented indicating the reason for the inaction on the Plaintiff's loan was due to any delay by Apponaug in delivering financial information. Vales, in fact, did not know the reason or the delay in processing the loan.
 DEFENDANT'S COUNTERCLAIM
Other than evidence regarding its request for declaratory relief, Defendant presented no credible evidence with regard to compensatory or punitive damages or attorneys fees.
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
At the conclusion of the trial, the Court requested proposed findings of fact and conclusions of law from both sides. In light of its analysis of the case, it adopts many of those submitted by the Defendant.
 FINDINGS OF FACT
(1) Plaintiff, Andrew J. Matteo, is a resident of North Providence, Rhode Island. Prior to 1998 and 1999, Matteo had purchased, sold and financed several commercial properties.
(2) Apponaug Mini Storage, Inc. is a Rhode Island Corporation with its principal place of business located in Warwick, Rhode Island. Kevin Kernan is the owner, sole stockholder and president of Apponaug.
(3) Kernan is the owner of Apponaug Mini Storage, a storage facility located in Warwick.
(4) In late October 1998, Matteo and Apponaug began negotiating his purchase of the property and reached agreement on a purchase price of $375,000.
(5) In connection with the negotiations, John Dickson, Apponaug's real estate broker, provided financial information concerning the property to Matteo.
(6) The financial information received by Matteo was sufficient for him to prepare a bid for the purchase of the property.
(7) Manuel Vales, a commercial loan officer at Bank Boston, had a long-standing banker/customer relationship with Matteo.
(8) Matteo needed financing to cover 100 percent of the purchase price of $375,000.
(9) Sometime in November 1998, Vales also ordered the preparation of an appraisal by Newport Appraisal Group.
(10) In connection with the appraisal, Kernan authorized Dickson to provide financial information and other property information to Newport Appraisal.
(11) The appraisal was submitted to Vales and became part of Matteo's loan application.
(12) Apponaug's provision of financial information to Matteo and the appraisal prior to the execution of the PS Agreement was in substantial compliance with its obligations under the agreement with respect to disclosure of financial information.
(13) Gray and Charleson, from late November 1998 to the first week in January 1999, negotiated the PS Agreement.
(14) The PS Agreement provided that the agreed purchase price for the property was $375,000 and that "$15,000" is to be paid
(emphasis added) by buyer as a deposit upon signing "and the balance of $360,000 is to be paid at the time of the closing."
(15) Prior to the finalization of the terms of the PS Agreement, Gray requested that he be designated as escrow agent.
(16) The PS Agreement provided that "the deposit checks made hereunder shall be held in escrow by Paul E. Gray, Esquire, (the escrow agent), in accordance with the terms of this agreement with respect to any amount placed in escrow pursuant to this agreement."
(17) After Kernan signed the PS Agreement on behalf of Apponaug, Charleson sent it to Gray with a letter that stated, "This document is being sent to you in escrow and will be considered null and void unless I receive acknowledgment from you within seven days that you have received and deposited the deposit checks."
(18) Gray received a $500 check that Matteo had given to Dickson and Matteo delivered a $14,500 check to Gray sometime before January 14, 1999.
(19) At some point prior to January 14, 1999, Matteo specifically instructed Gray not to deposit the deposit checks into Gray's escrow account.
(20) Matteo's testimony that he "did not know" why Gray failed to deposit the deposit checks was incredible and is rejected by the Court.
(21) Gray never deposited the deposit checks into his escrow account and never informed Charleson about Matteo's instructions to him, as escrow agent, not to deposit the checks.
(22) Gray retained the physical deposit checks at his office.
(23) Gray, acting as escrow agent sent a letter to Charleson in which he stated, "I am enclosing a copy of my client's company check in the amount of $14,500 as the balance of the deposit.
(24) Gray never informed Dickson, Kernan, Charleson or any other representative of Apponaug that he had not deposited the deposit check.
(25) Apponaug was unaware of the failure of Gray to deposit the checks into his escrow account until Gray's deposition in 2005.
(26) Matteo failed to establish by competent and credible evidence that he possessed the funds in the account to support the negotiation of the $14,500 deposit check if it had been presented.
(27) The Court rejects as not credible and irrelevant Matteo's uncorroborated oral assertions of financial capability with respect to the down payment.
(28) The delivery condition in Charleson's January 7, 1999, letter specifically regarding the deposit of the check was never fulfilled by Gray.
(29) Apponaug at no time, orally or in writing, waived the condition set forth in Charleson's letter of January 7th, 1999.
(30) Said deposit was a condition precedent to the Defendant's performing under the PS Agreement.
(31) The original PS Agreement provided for a closing date of February 28th, 1999.
(32) The original PS Agreement did not contain a clause expressly stating that time was of the essence.
(33) The PS Agreement included a mortgage contingency clause that provided that the agreement would "terminate and become null and void and without recourse to any party" upon written notice by Matteo to Apponaug prior to January 31, 1999, of Matteo's inability to obtain a specified mortgage commitment.
(34) The agreement included a financial disclosures provision that allowed for Matteo's review of certified financial statements, signed tax returns and other books and records and allowed Matteo to terminate the agreement upon written notice by January 31, 1999, if he determined that the financial statements or records were not suitable.
(35) The agreement provided that the closing, not the remaining contingencies, could be extended to a date not later than the thirteenth business day after the agreed upon closing in the event that Matteo's attorney was unable to close the transaction on the closing date. This provision was never invoked by Gray, relied upon by Gray nor was it even mentioned at any time in correspondence between the parties.
(36) Gray admitted his business and other commitments did not prevent him from closing on March 31, 1999.
(37) Apponaug responded to Matteo and Bank Boston's request for information in a timely and reasonable fashion.
(38) At Gray's request, Apponaug executed an amendment to the PS Agreement on January 22nd, 1999. The amendment established a new closing date on March 31, with March 1 as the date for financial contingencies.
(39) The first oral or written request by Matteo for financial information, other than that previously supplied in 1998, came in Gray's letter of February 4 wherein he forwarded Matteo's signed copy of the amendment.
(40) On February 19th, Dickson sent signed tax returns for Apponaug to Vales.
(41) By March 5, Gray had the signed tax returns and the 1998 income and expense statement for Apponaug.
(42) There is no evidence in the record that Bank Boston required certified financial statements to process Matteo's loan or that the lack of them delayed the process.
(43) The signed 1996, 1997 tax returns, except for the signatures of Kernan, were identical to the tax returns provide to Matteo in 1998.
(44) Apponaug acted with reasonable diligence and promptness in its response to Matteo's February 4 request for financial information.
(45) No competent evidence was presented that indicated that the reason for the delay in approval of Matteo's loan application was due to any delay by Apponaug delivering financial information.
(46) Matteo's testimony asserting that the only reason for the delay in the loan approval is rejected by the Court as uncorroborated. Further, Vales did not know the reason why there was a delay.
(47) On February 26, 1999, Gray terminated the PS Agreement in writing citing Matteo's failure to obtain a mortgage commitment.
(48) Gray's termination was "subject to the execution of the second amendment of the PS Agreement," which amendment was never executed.
(49) On March 5, 1999, Charleson informed Gray that despite Gray's request for a second amendment, "I do not think my client is inclined to sign another extension."
(50) Given the expiration of the contingency time limits in the PS Agreement and Charleson's March 5 letter indicating no additional extension would be granted, time became of the essence under the PS Agreement. This became more apparent when Apponaug agreed to close the transaction by the "drop dead date" of April 7, 1999.
(51) Time was of the essence with respect to the date of April 7, 1999.
(52) No closing was scheduled or took place on April 7, 1999.
(53) On April 9th, Gray informed Charleson that the bank had approved Matteo's loan and that closing could take place on or before April 16th, 1999. However, no closing was scheduled for that date on or before that date.
(54) On April 17th, 1999, Charleson authorized Gray to return Matteo's deposit to him upon delivery of a release to Charleson.
(55) Bank Boston issued a letter on April 23rd for a first mortgage of $308,000.
(56) Matteo waited an additional six days, to April 29th, to countersign the commitment letter. On April 30th, Gray represented to Charleson that Matteo was ready to close the transaction in May 1999.
(57) Bank Boston would not provide primary financing without a standstill agreement from the second lender.
(58) At no point from January 7th to May 3rd, 1999, did Matteo have a binding commitment from Ciccone to loan monies needed by Matteo to close.
(59) On May 3, 1999, Charleson reconfirmed that Apponaug would not close the transaction because of Matteo's failure to close in a timely manner and Matteo's previous termination of the PS Agreement.
(60) As of May 7th, Matteo was still not ready, willing and able to close in as much as Bank Boston had still not received any of the details of the proposed second mortgage.
(61) No closing took place on either May 12th or May 19th with regard to this transaction.
(62) The only basis claimed by Matteo for his inability to close within the time limits set forth in the PS Agreement, its amendment and the "drop dead date" was Apponaug's alleged failure to provide financial information in a timely manner, and this claim was not established by the evidence presented.
(63) Matteo failed to establish, by clear and convincing evidence, that at any time prior to the instigation of this action he was ready, willing and able to close the transaction.
(64) Defendant has failed to prove its claim for either compensatory or punitive damages or attorneys fees but has satisfied this Court with regard to its claim for declaratory relief, including the ordering of Plaintiff to remove any liens presently on the property and the declaration that the PS Agreement is null and void and of no further effect.
 CONCLUSION OF LAW
1. The equitable remedy of specific performance is granted not as a mater of right, but within the sound discretion of the court.
2. As the party seeking specific performance, Matteo must show by clear and convincing evidence that the equitable remedy of specific performance is proper.
3. Gray's continuing nondisclosure of his failure to deposit the check up through the date of his deposition in 2005 was a continuing breach of his duties as an escrow agent.
4. The actions of Gray and Matteo demonstrate a lack of good faith, also precluding the right to specific performance.
5. Charleson's January 7, 1999 letter to Gray enclosing the executed PS constituted a conditional delivery of the PS.
6. The deposit of the check(s) into Gray's escrow account was a condition precedent that was never satisfied and therefore contract formation of the PS Agreement was incomplete.
7. Gray, acting as the escrow agent in the letter of conditional delivery, had the duty to hold the PS until performance of the conditions of delivery.
8. The failure of Gray to deposit the deposit check in contradiction of the letter of tender prevented a contract from being formed and thus precludes any action for specific performance.
9. The parol evidence rule does not preclude the introduction of parol evidence to show the condition precedent to the effectiveness of a contract.
10. Matteo, in instructing Gray not to deposit the check, and in his continuing failure to reveal the lack of a deposit, is guilty of unclean hands thus precluding the equitable remedy of specific performance.
11. The financial disclosures contingency provision required only that Apponaug produce specified financial information within a reasonable time after request by Matteo.
12. Matteo's termination of the PS on February 26, 1999 (through Attorney Gray) was an effective and unequivocal termination of the PS pursuant to the terms of both the mortgage and inspection contingency clauses under the PS.
13. Once the PS was terminated by Gray on February 26, 1999, Matteo could not seek to specifically enforce the PS.
14. Apponaug's actions after Matteo's termination of the PS on February 26, 1999 in supplying financial information and communicating with Gray relating to the closing did not reverse or negate the termination but were an accommodation to Matteo and did not resurrect the PS.
15. Although the PS did not originally provide that time was of the essence, a purchaser must complete the transaction "within a reasonable period" after the closing date. However, even when time is not of the essence in the original contract, subsequent extensions and negotiations between the parties can establish a "drop-dead" date or time of the essence clause, after which no further extensions would be granted and the seller could terminate the contract.
16. Charleston's March 31, 1999 letter established April 7, 1999 as a legitimate "drop dead date" after which Apponaug could terminate the contract. The delay in closing from this date to May 19 was unreasonable.
17. Apponaug's supply of financial information before and after the signing of the PS was in substantial compliance with the terms of the financial disclosure provisions of the PS.
18. Apponaug's lack of production of "certified financial statements" was not a material breach of the PS and did not cause a delay in Matteo's financing.
19. Matteo's failure to present credible evidence of his damages precludes any award of damages.
20. Matteo failed to meet his burden of clear and convincing evidence proving a right to specific and he failed to prove that he was ready, willing and able to fulfill all of the requirements of the PS. While Defendant is entitled to declaratory relief, it has failed to prove, by a preponderance of the evidence its demand for compensatory or punitive damages or for attorney's fees.
 CONCLUSION
Based upon its analysis, findings of fact and conclusions of law, this Court declares that the Purchase and Sales Agreement and the amendment of the Purchase and Sales Agreement are null, void and of no effect and that the recordation in the land evidence records of the Purchase and Sales Agreement, amendment of Purchase and Sales Agreement and Notice of Lis Pendens was wrongful. This Court orders Plaintiff to immediately execute and record in the land evidence records of the City of Warwick a release of the Notice of Lis Pendens and a termination of the Purchase and Sales Agreement and amendment of the Purchase and Sales Agreement. All other prayers of the Defendant counterclaimant are denied as are all of the Plaintiff's claims. Counsel shall submit an order consistent with the Decision.
[1] The termination became moot when plaintiff returned the signed amendment.
[2] Among other things, the commitment required an agreement as to secondary financing. At trial, Orlando Ciccone testified to the general terms of such financing between him and the plaintiff.
[3] There is some mention of the date being May 12, but the Court notes Matteo referred to May 19 as the date that he went to the "closing".
[4] Plaintiff recognizes that there would have to be an adjustment wherein the purchaser is allowed the rents and profits of the land or its rental value and the seller, interest on the purchase money from the time fixed by the contract to the day when conveyance is made. When, however, the delay in the performance is the vendor's fault and interest exceeds rents and profits, the seller will be allowed to retain rents and profits but allow no interest.
[5] While Matteo may have had funds in his account to cover his checks, there was no evidence that these funds were in any way frozen for payment of them.
[6] As further proof of plaintiff's bad faith, reference is made to Gray's letter to Charleson of May 3 wherein he contends, "My client has also lost the use of his deposit since January."