Gbenga **LAJAYI**

v.

Adebo **FAFIYEBI** et al.

No. 2003–618–Appeal.

Supreme Court of Rhode Island.

Nov. 17, 2004.

682

James Moretti, Cranston, for Plaintiff.

Brian J. Spero, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, and SUTTELL, JJ.

## OPINION

PER CURIAM.

A Superior Court judgment granting specific performance of two real estate purchase and sales agreements is the focus of this appeal. The unexpected rejection of the buyer's mortgage financing application on the day originally specified for the closing precipitated the demise of contractual relations between the parties. The buyer expeditiously arranged for alternate financing, and attempted to extend the terms of the agreements. The seller, however, maintained that the buyer's failure to comply with a mortgage contingency provision nullified the agreements. After a jury-waived trial, the trial justice, ruling that the lack of a "time is of the essence" clause in the agreements required the buyer only to consummate the transactions within a reasonable period, ordered specific performance.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the record and the memoranda that the parties filed, we are of the opinion that cause has not been shown, and shall proceed to decide the case at this time. For the reasons hereinafter set forth, we affirm the judgment.

### Facts and Travel

Because the dispositive question on appeal turns upon a construction of the terms of the purchase and sales agreements (agreements) and an analysis of the actions of the parties, the facts will be recited in some detail.

The defendant, Adebo Fafiyebi (seller or

defendant),[1] owns two parcels of land next to each other at 76–82 Harold Street and 82–88 Allston Street in Providence, Rhode Island. On February 19, 2003, seller entered into separate purchase and sales agreements with plaintiff, Gbenga Lajayi (buyer or plaintiff), for each parcel. The purchase and sales agreements were prepared using preprinted forms obtained from the Rhode Island Association of Realtors. The separate agreements were virtually identical, except that the sale price for the Allston Street property was $310,000 and the sale price for the Harold Street property was $300,000. Buyer tendered a $20,000 deposit on the purchase of the two properties.

Under paragraph 7 of the agreements, buyer was required to submit a mortgage commitment letter from a mortgage institutional lender to seller by April 30, 2003. Paragraph 6 of the agreements allowed buyer to waive the mortgage contingency at the time of entering into the agreements. Additionally, pursuant to paragraph 7, buyer could waive the mortgage contingency by written notice. The mortgage contingency clause provided that if buyer complied with certain conditions and was unable to obtain the specified financing, the agreements would be declared null and void and all deposits made would be refunded. Paragraph 7 required buyer to comply with three conditions to take advantage of its escape provision. First, buyer was required to apply for the specified mortgage within seven days after the agreements were signed. Second, paragraph 7(b) required buyer to obtain a mortgage commitment or denial from a lender and provide a copy of this commitment or denial to the seller within four days of receiving it, but "in no event later than the Contingency Date." The parties chose a contingency date of April 30, 2003. Third, paragraph 7(d) provides that if buyer has not received a commitment or denial by the contingency date, buyer may, by written notice to the seller, request an extension of the contingency date. If seller refused to grant the requested extension, paragraph 7(d) of the agreement provided that the agreements were declared null and void and buyer was entitled to have his deposits returned. Paragraph 7(e) provided that "[i]n the event the Buyer has not provided a copy of the written commitment or denial for such mortgage and has not given written notice as specified in 7(d) to the Seller or Listing Agent by the Contingency Date or extensions thereof, then the Buyer shall be in default of this Agreement, shall forfeit all Deposits, and this Agreement shall be deemed null and void."

The agreements specified a closing date of May 9, 2003, but did not include a "time is of the essence" clause. The events and actions by or on behalf of the parties on and after May 9, 2003, are very much in dispute, and ultimately led to this litigation. The buyer filed two separate actions on June 16, 2003, seeking specific performance of the agreements and monetary damages.[2] These separate actions were consolidated in the Superior Court by order entered on July 31, 2003. A bench trial was held on August 8 and 12, 2003.

---

1. Adebo Fafiyebi apparently is the principal of the other named defendant, Debo Properties, Inc. The plaintiff originally filed separate actions against the two defendants. A Superior Court justice consolidated these actions by order entered on July 31, 2003. At trial the two defendants essentially were treated as one entity.

2. At the close of trial, the buyer presented no evidence with respect to the damages claim. After awarding specific performance, the trial justice said that upon the closing of the transactions, the damages count may be dismissed in each of the complaints.

At trial, Lori Ann Raposa (Raposa), loan officer for Domestic Bank, testified about the events that occurred on May 9, 2003. Raposa testified that on the morning of May 9, she was concerned that the closing might not take place that day because the mortgage insurance had not yet been approved. She said that she telephoned seller's real estate agent, Stephen Manson (Manson), and talked to him about the possibility of rescheduling the closing for the next week. Raposa reported that Manson indicated that that would not be a problem, but he would have to confirm whether seller would agree to give an extension. She also indicated that there had been no request for an extension before May 9, 2003. Raposa also testified that after the mortgage application was rejected later that day, she informed Manson that she would prepare rejection letters. At that point Raposa considered the deal dead, and she was no longer involved with these properties.

Robert Stevens (Stevens), senior loan officer for Direct Home Mortgage, testified next. Stevens testified that buyer contacted him on May 12, 2003 about financing for the two subject properties and submitted an application for financing on May 13, 2003. Stevens noted that buyer informed him that the deal was in jeopardy and that there was a chance that seller might not go through with it. Stevens testified that buyer received automated underwriting approval on May 14, 2003, and mortgage commitment on May 15, 2003. Stevens communicated the automated underwriting approval to Manson by telephone and by facsimile transmission on May 14, 2003. Direct Home Mortgage issued commitment letters for the two properties on May 19, 2003, and Stevens informed Manson by telephone and facsimile on that same day. Stevens acknowledged that on May 19, 2003, Manson told him that he was not sure whether defendant would be "coming to the table or not" for the closing. Nevertheless, Stevens continued to prepare for a scheduled closing on May 30, 2003, "to the point where money was wired to the attorney."

Lajayi testified that he had informed Manson prior to the April 30, 2003 contingency date that his financing had been approved subject to mortgage insurance. He testified that Manson called him around 9 a.m. on May 9, 2003, and told him that "he wanted to hold on the closing" because the seller was having a problem with another property he was buying out of state. He further testified that later that morning, he called Manson back and complained about not being aware of the out-of-state purchase. Manson informed him that he also just had become aware of the out-of-state purchase. Despite believing that the sales were not going to close that day, buyer went to Domestic Bank that afternoon, where he was informed that the mortgages had been denied. The buyer said that he immediately called Manson and informed him that he would be "going to someone else" to obtain financing, and that Manson informed him that he should come to his office on May 10, 2003, to sign an extension.

The buyer went to Manson's office on May 10, 2003, and signed two extensions— one indicating that the closing would take place on May 23, 2003, and the other leaving the closing date open. The seller, however, never signed the extensions. The buyer testified that he again informed Manson that he would obtain alternate financing and provided him with the business card of the new loan officer. The buyer noted that Manson said that he had informed seller that he would obtain alternate financing. The buyer averred that he informed Manson on May 14, 2003 of the mortgage approval and that Manson informed him on May 16, 2003 that seller

was returning his deposits. The buyer testified that he demanded a closing for May 30, 2003, and that seller failed to attend. A letter from buyer's attorney dated May 28, 2003, scheduling the closing for May 30, 2003, also was admitted into evidence. On cross-examination, buyer indicated that before he attempted to schedule the closing for May 30, 2003, Manson informed him that seller would not appear at any closing and that the deal was terminated. On June 1 or 2, 2003, buyer received a letter from seller, dated May 29, 2003, stating that the deals were terminated.

After buyer testified, seller's attorney made a motion for judgment as a matter of law. The seller argued that the mortgage contingency contained in paragraph 7 was a condition precedent, and that buyer's failure to satisfy that condition nullified the agreements. However, the trial justice interpreted paragraph 7 as being for the benefit of buyer, and denied seller's motion.

The trial continued with Manson testifying. Manson testified that seller informed him on or about May 4, 2003 of seller's need to close on May 9, 2003 because of seller's need to complete an out-of-state purchase to take advantage of certain federal tax provisions. Manson informed buyer of the seller's related sale on the morning of May 9. Manson also appeared to indicate that the parties did not originally designate May 9, 2003 as a firm closing date. At one point, Manson stated, "[t]his was a shooting date, yes. Before, we kind of thought that that was going to happen on May 9." Manson testified that on the morning of May 9, 2003 he called seller immediately after buyer informed him of the mortgage denial, and seller informed him to "just hold off on everything." On May 12, 2003, seller called Manson and said that the "deal was dead."

Manson then called buyer and informed him that the sale would not be completed. Manson also testified that he informed buyer on either May 12 or 13, 2003 that seller was returning his deposits, but he never sent a release form to buyer.

Fafiyebi testified that on May 12, 2003 he instructed Manson to inform buyer that the deal "is totally dead." The seller stated that all his communications with buyer were through Manson, and that the first time he met or spoke to buyer was at trial. He also revealed that Manson had informed him that buyer was looking for an extension, although he did not supply the date of this conversation. Additionally, seller said that Manson informed him on May 13 or 14, 2003 that buyer had applied for alternate financing.

On August 22, 2003, the trial justice issued a bench decision. The trial justice specifically found that the mortgage contingency provisions of the agreements were for the benefit of buyer. However, the trial justice also found that neither party paid attention to the mortgage contingency provisions, except for the fact that buyer did make a timely application to Domestic Bank for financing. The trial justice noted that by failing to take advantage of the provisions of paragraph 7, buyer was "essentially barred * * * from saying there was no deal, leaving him open under the terms of the agreement that so provided for damages for his failure to consummate." The trial justice concluded that because the agreements did not contain a "time is of the essence" provision, buyer was only required to consummate the transactions within a reasonable period after the appointed closing date. The trial justice determined that buyer's application for alternate financing within "two or three days" after the closing date and his subsequent quick approval for financing demonstrated that buyer had acted within a rea-

sonable time to consummate the deal. The trial justice awarded specific performance to buyer and gave the parties thirty days to close on the properties.

Final judgment was entered on August 27, 2003. The seller filed a notice of appeal on the same day. An amended judgment was entered on September 26, 2003, allowing buyer sixty days to close on the properties.

### Analysis

■■■ "The grant of a request for specific performance is not a matter of right but rests within the sound discretion of the trial justice." *Eastern Motor Inns, Inc. v. Ricci*, 565 A.2d 1265, 1269 (R.I.1989). A grant of specific performance is appropriate when "a party to a real estate agreement unjustifiably refuses or fails to perform under the agreement." *Yates v. Hill*, 761 A.2d 677, 679 (R.I.2000). "On appeal this court will not disturb a trial justice's ruling on a specific performance claim unless the appellant demonstrates an abuse of discretion or error of law on the part of the trial justice." *Thompson v. McCann*, 762 A.2d 432, 436 (R.I.2000) (quoting *Eastern Motor Inns, Inc.*, 565 A.2d at 1269).

■■■ The trial justice interpreted paragraph 7 as being for the benefit of buyer, in that it allowed buyer to walk away from the deal if he complied with the conditions of paragraph 7. As a party may waive a condition precedent if the condition is for the benefit of the waiving party, *Thompson*, 762 A.2d at 436, the trial justice determined that buyer waived the contingency clause.

■■■ " 'Contract interpretation is a question of law * * *.' " *Dubis v. East Greenwich Fire District*, 754 A.2d 98, 100 (R.I.2000). Questions of law "are reviewed *de novo* by this Court." *Perry v. Garey*, 799 A.2d 1018, 1023 (R.I.2002) (quoting *Associated Builders & Contractors of*

*Rhode Island, Inc. v. Department of Administration*, 787 A.2d 1179, 1184 (R.I. 2002)). "A reviewing court has no need to construe contractual provisions unless those terms are ambiguous." *A.F. Lusi Construction, Inc. v. Peerless Insurance Co.*, 847 A.2d 254, 258 (R.I.2004). "In making this determination, the court should view the agreements in their entirety and give the contractual language its 'plain, ordinary and usual meaning.' " *Id.* "[T]his Court will deem agreements to be ambiguous when they are reasonably and clearly susceptible to more than one rational interpretation." *Id.*

■■■ Our review of paragraph 7 of the purchase and sales agreements leads to the conclusion that paragraph 7 did not exist solely for the benefit of buyer, but rather was for the mutual benefit of the parties. The buyer clearly was benefited by the provisions of paragraph 7, which allowed him to terminate the contract and have his deposit returned if he was unable to secure financing before the contingency date. Paragraph 7(e), on the other hand, provided a benefit for seller. Paragraph 7(e) states that "[i]n the event the Buyer has not provided a copy of the written commitment or denial for such mortgage and has not given written notice as specified in 7(d) to the Seller or Listing Agent by the Contingency Date or extensions thereof, then the Buyer shall be in default of this Agreement, shall forfeit all Deposits, and this Agreement shall be deemed null and void." The seller was obliged to keep the property off the market while buyer explored his ability to obtain financing. However, the seller derived a benefit from paragraph 7(e) through the ability to cancel the sale before the date of closing if it became apparent that buyer would be unable to complete the purchase. Likewise, the provision benefited seller by establishing a deadline after which the seller

could assume that buyer intended to complete the transaction.

■ Although paragraph 7(e) lacked any requirement of notice, and appeared to indicate that the agreements terminated automatically if buyer had not provided a copy of the written mortgage commitment or denial or had not given written notice as specified in the agreements, such an interpretation is unwarranted. "We think the only way the agreement can be interpreted as a rational instrument, satisfying the primary intent of the parties that the property be sold, as well as their subsidiary interests reflected in the mortgage contingency clause, is to recognize, even in the absence of a formal notice requirement, an implicit requirement that, to bring into play the 'null and void' provision, one party communicate to the other some form of notice." *Tremouliaris v. Pina*, 23 Mass. App.Ct. 722, 505 N.E.2d 225, 227 (1987). The duty of good faith and fair dealing, implied in every contract, would require some communication by seller if he chooses to call off the sales, since buyer may be incurring expenses in anticipation of acquiring the properties. *See Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I.2002) (" 'Virtually every contract contains an implied covenant of good faith and fair dealing between the parties.' ").

■ Although we hold that the trial justice made an error of law in interpreting the mortgage contingency clause at issue in this case as existing solely for the benefit of the buyer, this holding is not dispositive. It is clear from the testimony at trial that it was not until after the originally selected closing date of May 9, 2003, that seller attempted to take advantage of his rights under paragraph 7. Such conduct amounts to a waiver of any right seller possessed under paragraph 7. "[W]aiver is the voluntary intentional relinquishment of a known right. It results

from action or nonaction * * *." *Haxton's of Riverside v. Windmill Realty, Inc.*, 488 A.2d 723, 725 (R.I.1985) (quoting *Pacheco v. Nationwide Mutual Insurance Co.*, 114 R.I. 575, 577, 337 A.2d 240, 242 (1975)). "As a general rule, the question of whether a party has voluntarily relinquished a known right is one of fact * * *." *Haxton's of Riverside*, 488 A.2d at 725–26.

As noted above, the trial justice found that neither party paid attention to the mortgage contingency provisions, except for the fact that buyer did make a timely application for financing. Likewise, our review of the testimony at trial reveals that all involved—buyer, seller, banker, and broker—proceeded to May 9 with the intention of closing on the properties. Similarly, by May 9, 2003, the purpose of the contingency clause had passed. As illustrated above, buyer benefited from the contingency clause by having the ability to withdraw from the agreements if he was unable to obtain financing. However, by May 9, 2003, his ability to take advantage of this provision had passed and he was obligated to complete the purchases or forfeit his deposits. The seller benefited from the contingency clause by having the ability to cancel the sales before the date of closing if it became apparent that buyer would be unable to complete the purchases and by establishing a deadline after which the seller could assume that buyer intended to go through with the sales. As of May 9, these benefits had passed. By failing to avail himself of the provisions of the mortgage contingency clause, seller effectively and unequivocally waived the benefit of that clause and thereby became unconditionally bound to fulfill his obligations under the agreements.

■ The trial justice concluded that because the agreements did not contain a "time is of the essence" provision, the buy-

er was only required to consummate the transaction within a reasonable period after the appointed closing date. The trial justice determined that buyer's application for alternate financing within "two or three days" after the closing date, and his subsequent quick approval for financing, demonstrated that buyer had acted within a reasonable time to consummate the transactions.

■■■ "Ordinarily contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that a breach of the time element will excuse nonperformance. * * * However, this principle does not mean that a party can be completely oblivious to a stipulation in a contract relating to time, but it assumes that a party to a contract will proceed in good faith towards the completion of his undertaking." *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 114, 265 A.2d 429, 435 (1970). Also, generally, in contracts for the sale of land, payment or conveyance at the exact time specified in the agreement is not required because " 'the injury caused by delay is little or nothing. Delays are frequent in these transactions; and it is the custom of [people] to overlook them, even though they may have stated in advance that they would not.' " *Thompson*, 762 A.2d at 438 (quoting *Kalinowski v. Yeh*, 9 Haw.App. 473, 847 P.2d 673, 677 (1993) and 3A A. Corbin, *Corbin on Contracts* § 716 at 367 (1951)); *see also Safeway System, Inc. v. Manuel Bros., Inc.*, 102 R.I. 136, 145–46, 228 A.2d 851, 856–57 (1967) (explaining that in the absence of an enforceable "time is of the essence" provision, a party has a reasonable time to perform).

The trial justice in this case had before him ample evidence to support his finding that buyer acted with due diligence in obtaining alternate financing and attempting to effectuate the closing on the proper-

ties. The record shows that on May 10, 2003, buyer went to the office of Manson, seller's agent, and signed two extension agreements. The record also shows that buyer applied for alternate financing on May 13, 2003, obtained computerized approval on May 14, 2003, and received a commitment letter on May 19, 2003. By the time buyer secured alternate financing it was still only ten days after the original closing date. We conclude that, under these circumstances, the trial justice did not abuse his discretion by requiring seller to proceed with a closing on the properties.

When the closing anticipated for May 9, 2003, fell through, seller indicated that he might not go forward with the transactions. However, he did not convey his intent to cancel the agreements until a later time. Exactly at what point he conveyed his intention to buyer is not conclusive. Manson testified that he called buyer and informed him that the sale would not be completed on May 12, 2003. The seller signed release forms for the deposits on May 18, 2003; however, these release forms apparently never were forwarded to buyer. Furthermore, the first written notice that seller was attempting to terminate the agreements was mailed on May 29, 2003. Notably, this is the day after buyer's attorney sent a letter to seller demanding a closing on May 30, 2003. Therefore, we conclude that seller's nullification letter of May 29, 2003, was invalid.

■■■ "[W]hen a buyer has at all times been ready, willing, and able to perform his or her part of an agreement to transfer real estate, the buyer is entitled to specific performance of that contract in the absence of a legitimate and articulable equitable defense." *Thompson*, 762 A.2d at 436; *see also Griffin v. Zapata*, 570 A.2d 659, 662 (R.I.1990) (" 'It is well established that the party who wishes to avail himself of the unique remedy of specific perform-

ance must show that he was ready, able and willing to perform his part of the contract.'"). The trial justice credited the buyer's efforts with enabling him to be ready, willing, and able to close on the properties within a reasonable time. The trial justice did not find that the seller had any legitimate or articulable equitable defenses. We find no fault with the trial justice's evaluation of the equities surrounding this situation, and thus uphold his judgment requiring the parties to perform their obligations under the agreements.

### Conclusion

For these reasons, we conclude that the trial justice did not err in ordering specific performance of the purchase and sales agreements. Hence, we affirm the judgment, and remand the record to the Superior Court.

Justice FLAHERTY and Justice ROBINSON did not participate.