DECISION
This matter came before the Court for a jury-waived trial. The Court has carefully considered the evidence presented at trial and the post-trial memoranda.
 Findings of Fact
In 2002, Keystone Properties and Development, LLC ("Keystone"), a company managed by Mr. John Laurito, entered into a written Purchase and Sales Agreement to purchase property on Douglas Avenue, Providence, Rhode Island, from Steven Campo. The Agreement was prepared by a realtor and signed by the parties. A deposit was paid. The Agreement called for a closing on July 15, 2002 at a purchase price of Nine Thousand ($9,000) Dollars. The Purchase and Sales Agreement is a standard Rhode Island realtor's form. Some language is notable: the date for performance was set, and amended by two subsequent written documents. Time was never of the essence.[1] *Page 2 
The closing was delayed several times by assent of the parties. (See Exhibit 4.) Keystone appeared with the funds and a title search at a November 1, 2002 closing. Mr. Campo also attended, and after the settlement sheet and the deed were signed by Mr. Campo, Mr. Campo indicated that he owed his father money on the property. After some discussion about what Mr. Campo may have signed for his father, and a telephone call to the title insurance company, Attorney Pezzullo, the attorney conducting the closing, wrote "Void" on the closing documents and declared that the closing would not occur until any lien on the property was released. While Attorney Pezzullo discussed the significant problem in going forward with the closing in November 2002, he never indicated that the Agreement was voided nor did Keystone. Attorney Pezzullo stopped the closing immediately after communicating with the title insurer as the property could not be insured.
Ms. Johnson, the realtor, attempted to assist in clearing up the remaining issues, but Mr. Campo remained difficult for her to contact. In January 2003, Attorney Pezzullo refunded the closing funds to Keystone, but Ms. Johnson continued to hold the deposit. The Agreement was never expressly cancelled. *Page 3 
In January 2003, Attorney Ferrieri, representing Keystone, wrote to Mr. Campo indicating that Keystone was still anxious to close, pursuant to the Agreement. Mr. Laurito of Keystone also attempted to contact Mr. Campo and received no response.
The realtor continued to attempt to return the deposit money in 2003, but the Buyer did not accept the funds. In 2004, Keystone proposed to purchase the property "as is," if Mr. Campo agreed to be responsible for the lien on the property, if any existed. In April 2004, the realtors discovered that they were still holding the deposit and issued a check to Keystone, which was not cashed.
The complaint herein was filed in November of 2003. It requests specific performance and costs.
 Analysis
Keystone prays for the grant of specific performance. The Rhode Island Supreme Court has clearly set the significant burden which a plaintiff must meet to obtain specific performance. For real estate conveyances "A grant of specific performance is appropriate when `a party to a real estate agreement unjustifiably refuses or fails to perform under the agreement.'"Lajayi v. Fafiyebi, 860 A.2d 680, 686, (R.I. 2004) quotingYates v. Hill, 761 A.2d 677, 679 (R.I. 2000).
To qualify for specific performance concerning real estate under a written contract, a party must establish that "he or she was at all times ready and willing to perform the contract[.]" Sturbridge HomeBuilders, Inc. v. Downing Seaport, Inc., 890 A.2d 58, 64 (R.I. 2005), quoting Fracassa v. Doris, 814 A.2d 357, 362 (R.I. 2003). However, specific performance may not be available when the defendant establishes "a legitimate and articulable equitable defense.'" Fracassa,814 A.2d at 362. *Page 4 
For specific performance "[T]he essential terms of the contract must be clear, definite, certain, and complete" before a court can properly award specific performance of a real estate contract. DePetrillo v.Lepore, 871 A.2d 907, 909 (R.I. 2005), citations omitted. It must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties. Finally, the party seeking specific performance must demonstrate that he or she was "`ready, able and willing to perform.'" Id. at 909.
Keystone has demonstrated a binding, specific contract.
Specific performance is performance of the contract itself. Accordingly, a plaintiff must first demonstrate a binding, specific contract. Here, the parties entered into a Purchase and Sales Agreement for land. The Agreement was specific with deadlines, terms, the price and the land description. Mr. Campo did not convey the property timely with clear title. Neither party contests this.
Rather, Mr. Campo now claims that the contract was cancelled. The evidence presented does not justify this conclusion. While the closing attorney wrote "void" on the settlement sheet, there was no reliable evidence that the Purchase Agreement was voided. The parties left the room with the hope that the potential lien would be removed.[2] Mr. Campo agreed to attempt to *Page 5 
try to obtain a release and Attorney Pezzullo gave him a time limit. Mr. Campo also testified that he continued to try to get a discharge.[3]
There was no attempt to return the deposit money until Mr. Campo was personally served in December 2003. That check was not accepted by Keystone. Mr. Campo signed a cancellation form, but did so after he was served with process. The realtor was serving as Mr. Campo's agent throughout. The Seller attempted to move forward through many telephone calls.
Mr. Campo received several letters from attorneys threatening suit. He claims he never was able to obtain a discharge. Mr. Campo refused to indemnify the buyers for the contingent debt. Mr. Campo's testimony that he concluded as the attorneys never filed suit and he thought the deposit had been refunded by the realtor carries no credibility. To make this conclusion, he ignores the demand letters from attorneys and the telephone calls made to him by the realtor and Keystone.
Specific performance is an appropriate remedy for landcontracts.
As each piece of real property is unique, specific performance is especially appropriate, as money cannot always compensate. Dan B. Dobbs,Law of Remedies, § 22 at 847 (1973). See also Eastern Motor Inns, Inc.v. Ricci, 565 A.2d 1265 at 1277 (R.I. 1989). *Page 6 
Keystone was ready to buy.
To obtain specific performance, a plaintiff must establish that "he or she was at all times ready and willing to perform the contract[.]"Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d 58, 64
(R.I. 2005) quoting Fracassa v. Doris, 814 A.2d 357, 362 (R.I. 2003)
There is, of course, no question that Keystone was ready, willing and able to purchase through the date of the failed closing. There is no question that Keystone remains just as committed now. Viewed from Keystone's perspective, the company expected a response shortly after the failed closing, attempted to get a response by using the services of three different attorneys, and even sought to compromise the dispute. The efforts here to compromise the dispute should not be considered as a sign of reluctance, but as an ongoing commitment to acquiring the property, and never backing off. The record is devoid of any intent on the part of Keystone to abandon the Agreement. There was never a sign of reluctance, Keystone never backed off.
The Agreement was not subject to a mortgage commitment. Keystone delivered the balance of funds at the failed closing, and was financially able to remit the funds at another closing. In short, Keystone was ready, willing and able to purchase at all times.
The agreement was never rescinded.
Mr. Campo argues that the deal was mutually rescinded when Attorney Pezzullo announced that the closing was done and that all closing documents were void. While there may have been some confusion, Mr. Campo received his Rhode Island real estate broker's license at approximately the same time. If he was not already a licensed Rhode Island broker, he was *Page 7 
taking classes for his brokerage license, having completed several real estate transactions on his own. He understood the significance of the documents he signed, and his obligations.
As stated above, Keystone never demonstrated any intent to abandon or end the Agreement. While Attorney Pezzullo ended the closing, all participants expected Mr. Campo to obtain a discharge, as he had agreed. "[T]o have recission there must be mutuality expressed or implied."Jakober v. E.M. Loew's Capitol Theatre, Inc., 107 R.I. at 112,265 A.2d at 433-34. ". . . recission is defined as a mutual agreement by the parties to an existing contract to discharge and terminate their duties thereunder. Dulgarian v. City of Providence, 507 A.2d 448, 452 (R.I. 1986). Keystone never intended to rescind and never agreed to rescind.
Further, Mr. Campo never informed Keystone of any intent to rescind. At trial, he testified that he would attempt to procure a release from his father, and that he contacted an uncle to locate his father.[4]
Mr. Campo did not rescind or notify Keystone of any problem, he merely avoided the issue.
Mr. Campo breached the Agreement
The Agreement requires Mr. Campo to deliver "a good, clear, insurable, and marketable title to the Property, free from all encumbrances, except as may be acceptable to Buyer," Agreement, paragraph 9. At the closing, Mr. Campo failed to do so. Keystone never agreed to accept the title in any other form (though there were settlement discussions), and Mr. Campo never produced a mortgage discharge or paid note, as he agreed. He failed to meet his contractual obligations in the written agreement, or his oral agreement at the failed closing. *Page 8 
Not only did Mr. Campo breach his express obligations, he breached the covenant of good faith. In a recent case involving a disputed lease, the high court considered a lessee's failure to obtain financing and an environmental approval within an agreed time. The trial court found the lessee's failure to be a breach of its covenant of good faith. The Rhode Island Supreme Court affirmed the trial court holding:
 It is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about that happening. A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove. . . .
 . . . [T]he duty of good faith and fair dealing, implied in every contract, requires some form of notice before a party to that contract can cancel the agreement . . .
 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d 46, 56-7, (R.I. 2005), citations omitted.
Mr. Campo breached his covenant of good faith by ceasing to perform, never communicating his intentions to the waiting buyers and, apparently, expecting others to clear up the title. Mr. Campo remains in breach.
Relief requested.
During Court conferences, if not on the record, the Court instructed counsel to be specific in their post-trial briefs as to the type of relief that should be afforded. Keystone's complaint and brief simply requests the award of specific performance. While the Court has found sufficient grounds to grant specific performance, that is easier said then done.
The major problem in granting specific performance is that the Court cannot clear the defect in title. To vacate the lien would deprive Mr. Campo's father of whatever interest he may *Page 9 
have in the property, without any notice to him. Accordingly, the Court cannot order a conveyance of complete title, only what Mr. Campo now owns.
Nevertheless, apart from the defect in title, Keystone has made a sufficient showing to establish specific performance. It has demonstrated it has been, at all time, ready, willing and able to perform its part of the Agreement and hence it is "entitled to specific performance of that contract in the absence of a legitimate and articulable equitable defense." Lajayi v. Fafiyebi, 860 A.2d 680, 689
(R.I. 2004).
Accordingly, the Court orders the attorneys to appear before the Kent County Superior Court on October 31, 2007 to discuss an appropriate remedy. If Keystone desires to purchase the property in its present position (as potentially encumbered), the Court will order such a conveyance. The parties are instructed to review the Rhode Island Supreme Court discussion in DiBiasio v. DiFazio, 103 R.I. 565,239 A.2d 719, (R.I. 1968) concerning the award of limited specific performance.
[1] Paragraphs 9 and 20 of the Agreement state:
 9. Title: Seller covenants and warrants that it is the fee title owner of the Property and has the authority and capacity to enter into this Agreement and consummate the transaction contemplated herein. The Property is to be conveyed by a good and sufficient warranty deed of the Seller, conveying a good, clear, insurable, and marketable title to the Property, free from all encumbrances, except as may be acceptable to Buyer, and Buyer's Lender, if any, and except easements, restrictions of record and municipal regulations, if any. Buyer may at its own expense conduct a title examination of the Property. Buyer shall notify Seller of any defects in title disclosed by such examination. If Seller is unable to remove such defects, Buyer shall have the option to: (a) accept such title as Seller is able to convey without abatement or reduction of the Purchase Price, or (b) cancel this Agreement and receive a return of all Deposits. To enable the Seller to make conveyance as provided in this Agreement, the Seller may, at the time of the delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interest, provided that all instruments to be obtained are recorded prior to recording the deed, except for any discharge of mortgage from an institutional lender which may be recorded subsequent to the deed.
 * * * 20. Default: Upon default by the Buyer, the Seller shall have the right to retain the Deposits, such right to be without prejudice to the right of the Seller to require specific performance and payment of other damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default. If the Seller shall default in the performance of this Agreement, all Deposits shall be promptly returned to Buyer, and Buyer may pursue any and all remedies available to it at law or equity, including but not limited to specific performance.
[2] Although Mr. Campo testified that he thought the Agreement was cancelled unless he obtained a mortgage discharge in ten days, he signed the settlement statement which showed the monies returned to Keystone did not include the deposit. The broker, Mr. Campo's agent, never refunded the deposit, still in its account. Keystone's refusal to accept the returned deposit (during litigation) was consistent with it's contention throughout that the Agreement was still valid.
[3] Mr. Campo's relationship with his father is somewhat mysterious. He testified that he did not know his father's current address, and they had not spoken for years. While the family is estranged, the Court is not convinced that Mr. Campo met his contractual obligation or the express commitment he made at the failed closing, to attempt to clear the title promptly. Mr. Campo acknowledged that the attorney who wrote the father's loan documents may have more information on the mortgage, or whether it was a mortgage, but he never contacted the attorney. He expected other people to clear this lien for him, and to call the attorney. As Mr. Campo admitted that he was still indebted to his father, contacting his father could have opened the door to collection of the debt. Accordingly, Mr. Campo appeared less than candid.
[4] Mr. Campo's efforts to contact his father or obtain a release of the lien were limited. He had no direct contact with his father, and only tried to locate him through an uncle. While he knew the closing attorney for his acquisition of the property; but he did not try to contact him to see if a note or deed has been signed. *Page 1