DECISION
This matter was tried to the Court, without a jury, and relates to a real estate purchase and sale agreement (the "P S") for property located in Cumberland, Rhode Island, and identified as Plat 52l, Lot 262. The Plaintiff, Timothy C. Harrington ("Buyer"), signed a written P S to buy the property from Defendant, James Cardono ("Seller"). The Buyer now seeks an order of specific performance to require the seller to perform under that P S agreement (Count I of the Complaint). In the alternative, Buyer seeks damages for breach of contract and unjust enrichment. (Counts II and III of the Complaint.) In his counterclaim, Seller asserts that Buyer breached the contract and seeks to retain the deposit that Buyer made under the agreement. Jurisdiction is pursuant to G.L. 1956 § 8-2-13.
 I Facts and Travel
The material facts and documents as to this dispute have been agreed to, and set forth in, an Agreed Statement of Facts (introduced as a joint exhibit at trial). It is attached hereto and incorporated herein by reference. Accordingly, the Court need not make specific findings of fact *Page 2 
but will rely on the parties' stipulation. Insofar as the Court relies on findings of fact not set forth in the stipulation, it will state them in this Decision.
The property was undeveloped. In order for it to be "buildable," an individual sewage disposal system permit ("ISDS") had to be obtained from the Rhode Island Department of Environmental Management ("DEM"). The P S was entered into by the parties on March 17, 2001. The significant issue giving rise to this dispute is the Buyer's contingency contained in Section 22 of the P S. Said contingency stated that the sale was "subject to a successful percolation test, [and] subject to ISDS approval. . . ." No specific time limit was agreed upon concerning the time within which Buyer had to obtain the ISDS permit or exercise his contingency. Successful application for an ISDS permit would require a successful percolation test (perc test), and a time frame of sixty days from the signing was set forth as the time for Buyer to obtain the perc test. The Buyer, however, if he chose to "waive the contingency[,]" could accept the property "as is." The parties chose June 30, 2001, as the closing date. The P S did not contain a "time is of the essence clause."
The property is situated above a significant amount of ledge, a fact of which the seller was aware because a prior sale was not completed due to the inability of that buyer to obtain ISDS approval. Although several perc tests came back indicating a problem with the ledge under the property, Buyer never exercised his option to cancel the agreement due to negative results pursuant to the contingency clause. However, Buyer was unable to obtain a successful perc test within sixty days, and he did not obtain ISDS approval from DEM until September 28, 2004, at which time DEM sent notice of approval to Buyer. That approval followed several demands by DEM, and several amended applications and requests for variances, which were filed by Buyer based on revised design and engineering. *Page 3 
The Buyer did not formally notify Seller of these demands, but Seller followed the applicant's ISDS journey through contacts with the broker, Mr. Thomas J. Bousquet (Mr. Bousquet or "broker"). Furthermore, the status of the ISDS process was available online through the DEM website. The Buyer did not learn of the approval until on or about October 4, 2004, at which time Seller's lawyer, Mr. George M. Prescott (Mr. Prescott), advised Seller that approval from DEM had been received, and that Buyer wanted to schedule a closing on the property in accordance with a letter from Mr. Prescott to the broker dated July 24, 2001. It is clear from this chronology that the closing on the property did not occur on or before June 30, 2001, the date stipulated in the P S. Apparently, due to the fact that the closing did not occur at the scheduled date, Seller was obligated to pay municipal taxes from that date forward amounting to $4,385.42.
After Seller learned of the DEM approval and Buyer's desire to schedule a closing after the September 28, 2004 ISDS approval, Seller did not agree to schedule the closing at that time because he deemed Buyer to be in default of the P S, and deemed the P S of no further force and effect. However, Seller never notified Buyer or Mr. Bousquet that he considered the P S to be terminated, nor did he instruct Mr. Bousquet to return the Buyer's $1,000 deposit. In fact, Buyer's attorney, Mr. K. Joseph Shekarski, wrote to Seller about scheduling a closing by letter dated October 14, 2004. Despite this demand for closing, Seller refused to close
Meanwhile, Seller did not stand by idly awaiting notice of the ISDS approval or the exercise by Buyer of termination due to failure of the contingency. The property is contiguous to the site of the CVS corporate headquarters in Cumberland, and a (non-residential) sale to CVS would not require ISDS approval. In August 2004, Seller was contacted by a representative of CVS expressing interest in the property. In response to that inquiry, Seller sent a letter to the CVS representative on August 23, 2004, offering to sell the property to CVS for $150,000 *Page 4 
($110,000 more than the amount stipulated in the P S with Plaintiff), even though the original P S had not been terminated and Buyer's deposit had not been returned. CVS did not respond to the proposal, and the inquiry never resulted in a P S with CVS.
On January 4, 2005, Buyer filed the instant action in Kent County Superior Court seeking to enforce the P S through specific performance. In the alternative, he seeks damages for breach of contract and unjust enrichment. In response, Seller filed a counterclaim for breach of contract and he seeks to retain the $1000 deposit as liquidated damages. On February 28, 2005, an order was entered granting Buyer's "Motion to Change Venue and Transfer the Case to Providence County Superior Court."
 II Analysis
The question for this Court to determine is whether Buyer is entitled to relief by way of specific performance, and whether the P S remains in full force and effect — despite the passage of more than three years beyond the stipulated closing date. The answer to that question depends in part on whether the delay in Buyer's obtaining ISDS approval excused Seller's performance, or whether, after ISDS approval was obtained in September 2004, Buyer could require the Seller to complete the transaction by scheduling a closing. The Seller's position is that the P S had expired by its terms and that he, as Seller, is no longer obligated to sell the property to Buyer. While it is clear the stipulated closing date of June 30, 2001, has not been met, the question is whether the demand for closing, by letter dated October 14, 2004 — more than three years beyond the agreed closing date — is reasonable under the circumstances. See Lajaya v. Fafiyebi,860 A.2d 680, 688 (R.I. 2004) (stating "that in the absence of an enforceable `time is of the essence' *Page 5 
provision, a party has a reasonable time to perform") (citingSafeway System, Inc., v. Manuel Bros., Inc.,102 R.I. 16, 145-46, 228 A.2d 851, 856-57 (1967)).
It is well settled that "[t]he grant of a request for specific performance is not a matter of right but rests within the sound discretion of the trial justice." Lajaya,860 A.2d at 686 (quoting Eastern Motor Inns, Inc. v. Ricci,565 A.2d 1265, 1269 (R.I. 1989)). Furthermore, "[a] grant of specific performance is appropriate when a party to a real estate agreement unjustifiably refuses or fails to perform under the agreement." Id. (quoting Yates v. Hill,761 A.2d 677, 679 (R.I. 2000)).
"The duty of good faith and fair dealing, implied in every contract, would require some communication by Seller if he chooses to call off the sale[], since buyer may be incurring expenses [in this case engineering and legal costs] in anticipation of acquiring the properties." Lajaya, 860 A.2d at 687. In general,
 contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that a breach of the time element will excuse nonperformance. . . . However, this principle does not mean that a party can be completely oblivious to a stipulation in a contract relating to time, but it assumes that a party to a contract will proceed in good faith towards the completion of his undertaking. Also, generally, in contracts for the sale of land, payment or conveyance at the exact time specified in the agreement is not required because the injury caused by delay is little or nothing. Delays are frequent in these transactions; and it is the custom of [people] to overlook them, even though they may have stated in advance that they would not. Lajaya, 860 A.2d at 688 (internal citations and quotations omitted).
However, "[i]t is well established that the party who wishes to avail himself of the unique remedy of specific performance must show that he was ready, able and willing to perform his part of the contract." Jakober v. E. M. Loew's Capitol Theatre, Inc.,107 R.I. 104, 114, 265 A.2d 429, 435 (1970). *Page 6 
In the instant matter, the parties did not stipulate in the P S to the period within which Buyer had to obtain ISDS approval. Certainly, had Seller wanted to put time parameters on the ISDS contingency, such a provision could have been included to avoid the dilemma in which the parties find themselves now. In the absence of such agreed upon deadline for the Buyer's exercise of such a contingency, it appears to the Court that it must now consider what a "reasonable time" would be for the Buyer's performance.See Safeway System, Inc.,102 R.I. at 145, 228 A.2d at 856. (Observing that "[a] contract is not to be construed like a railway timetable. The parties to it need not be punctual to a minute, unless the contract calls for that degree of punctuality to carry out its purposes; but it is enough that they are on hand so as to keep their agreement, as regards the time, according to its substance and spirit; and it is the duty of each party to conduct with good faith and reasonable liberality towards the other.")
No evidence was presented to this Court as to the "normal" processing time for an ISDS application. However, in light of the difficult topography, of which the parties were aware at the time of the agreement, it appears to the Court that the parties should have expected a substantial passage of time for Buyer to obtain the proper engineering to support the application for an ISDS permit, and that DEM was likely to require detailed plans and testing before it would approve a septic permit on this site.
Rather than afford the Buyer an "unlimited" amount of time to obtain the permit, this Court must interpret the agreement to impose upon the Buyer a reasonable amount of time to exercise its ISDS contingency. What is reasonable must be tested by the facts and circumstances of the particular case. See Augustine v.Chateau Homes, Inc., 324 N.E.2d 633, 634 (Ill. App. 2d 1975) (recognizing that "unless tender of title is to be of the essence, a reasonable time for tender of title will be implied and what is reasonable is a matter of proof under the circumstances and conditions"). *Page 7 
Furthermore, in certain instances, a Seller's rights even may be deemed waived. See Beck v. Strong,572 S.W.2d 484, 488 (Mo. Ct. App. 1978) (holding that even where time was of the essence, the requirement that buyers exercise their purchase option within a specified time was waived where Seller allowed buyers to pay to improve the property and where they accepted monthly interest payments on the purchase price).
The agreement in the case at bar imposed a sixty-day time frame for Buyer to obtain a percolation report and a report regarding septic system design. Although the sixty-day time frame was not agreed to as the time frame for the exercising of the ISDS contingency, it appears that if the design had to be completed within sixty days, it seems reasonable that the ISDS contingency would have to be exercised within a reasonable time thereafter to allow sufficient time for DEM to process and review the application and design.
Failure of the contingency would excuse Buyer's performance, but Seller had to afford the Buyer a "reasonable" time to obtain the permit called for in the contingency. It appears to the Court that Buyer exercised due diligence in his attempt to obtain ISDS approval, and reacted promptly to the need for a revised design by hiring a new engineer, which design ultimately proved successful in obtaining the ISDS permit.[1] The Court must also weigh the equities as to Seller's actions. See Griffin v.Zapata, 570 A.2d 659, 661 (R.I. 1990) ("Specific performance is an equitable remedy.")
The Seller clearly knew that the ISDS process would be difficult and prolonged. Although he testified that at some point before the ISDS permit was granted, he "deemed" the *Page 8 
P S to be of no further force and effect, he never notified the broker or the Buyer of such a conclusion, and he never instructed the broker to return Buyer's deposit. Rather, Seller embarked on a concerted effort to sell the property to CVS at a price substantially higher than that which was agreed to with Buyer. Furthermore, although Seller has counterclaimed for the taxes he paid while awaiting the conclusion of the ISDS process, no such provision was contained in the P S.
Under the circumstances, it appears to the Court that Buyer exercised due diligence in his effort to obtain ISDS approval, and obtained such approval within a "reasonable" time. Having reached that conclusion, Buyer has a contractual right to require Seller to perform, and a closing should be scheduled forthwith because the equities favor the Buyer under the circumstances. The Court, therefore, orders specific performance of the P S. Since no legal or equitable grounds exist to award Defendant Seller the taxes he paid during the period awaiting ISDS approval, the Court will not award Seller any damages for those costs.[2]
Judgment for specific performance shall enter in favor of Plaintiff Buyer consistent with the conclusions set forth in this Decision. *Page 17 
 AGREED STATEMENT OF FACTS
1. Plaintiff Timothy Harrington ("Mr. Harrington") is a real estate contractor/developer operating under the name "Harrington Construction". Mr. Harrington and Harrington Construction are primarily in the business of building homes. Mr. Harrington's father, Timothy J. Harrington ("Mr. Harrington's Father"), also is in business with plaintiff. On average Mr. Harrington builds one to five homes per year.
2. Defendant James Cardono ("Mr. Cardono") is a retired Rhode Island lawyer and long-term resident of Cumberland, Rhode Island, who retired to Florida in 1999.
3. In March 2001, Mr. Cardono entered into a Purchase Sales Agreement (the "Agreement") with Mr. Harrington for the purchase of certain undeveloped property on Beausoleil Street in Cumberland, Rhode Island (the "Property") for $40,000. In accordance with the Agreement, Mr. Hanington provided a deposit of $ 1000. A true and correct copy of the Agreement is attached as Exhibit I to the Agreed Statement. Mr. *Page 2 
Cardono has not directed Mr. Bousquet to return the $1000 deposit to Mr. Harrington. No one requested the return of the deposit.
4. The real estate broker for Mr. Cardono in the Harrington/Cardono transaction was Thomas Bousquet ("Mr. Bousquet") of Coleman Realtors.
5. Before this transaction, Mr. Bousquet had identified two or three other pieces of property that Mr, Harrington or Harrington Construction purchased. Mr. Harrington's Father acted as an authorized representative for Mr. Harrington or Harrington Construction (formally incorporated in 2004).
6. In the transaction for Mr. Harrington's purchase of the Property, Mr. Harrington's Father had most of the direct contacts with Mr. Bousquet. The negotiations for the purchase, including discussions of price, occurred between Mr. Harrington's Father and Mr. Bousquet. Mr. Cardono communicated exclusively through Mr. Bousquest. At no point did Mr. Harrington, Mr. Harrington's Father, or anyone else from Harrington Construction ever communicate directly with Mr. Cardono, No one from Coleman Realtors other than Mr. Bousquet ever communicated with any of the persons named herein regarding the Agreement or the Property.
7. Before finalizing the terms of the Harrington/Cardono Agreement, Mr. Cardono and Mr. Harrington and Mr. Harrington's Father knew that there was some question as to whether ISDS approvals could be obtained from DEM for the Property.
8. During 2000, before the Harrington/Cardono Agreement, Mr. Cardono made one previous attempt to sell the Property and had entered into an agreement with a husband and wife ("Buyers") in January 2000 to sell the Property for $48,000 subject to a successful percolation test, ISDS approval and building permits. The Property failed the *Page 3 
Buyers' percolation test, as a result of which the Buyers terminated the agreement with Mr. Cardono and Mr. Cardono returned the Buyers' deposit upon notice of the failed percolation test and demand for return of the deposit. Before entering into the Harrington/Cardono Agreement, Mr. Harrington and Mr. Harrington's Father knew the facts described in this paragraph regarding the Property's prior failed percolation test.
9. On March 19, 2001, Mr. Cardono faxed a letter to Mr. Bousquet enclosing signed purchase and sale agreements for the Harrington purchase with several minor changes to the Agreement. Mr. Cardono wrote that "Assuming that the perc test is favorable, I will arrange for atty. George Prescott to prepare the deeds, arrange for the payment of taxes and to represent me at the closing." Mr. Harrington signed the Agreement with the minor changes made by Mr. Cardono. The Agreement, inter aha, set June 30, 2001 as the closing date. A true and correct copy of this letter is attached as Exhibit 2 to the Agreed Statement.
10. In March 2001, Mr. Harrington hired engineer David Garrigan ("Mr. Garrigan") to prepare a design plan and perform all of the other work that would be needed to secure appropriate ISDS approvals.
11. Mr. Garrigan submitted an application to the Rhode Island Department of Environmental Management ("DEM") in May 2001 on behalf of Mr. Harrington.
12. In June 2001, DJ3M rejected the application made to DEM by Mr. Garrigan in May 2001 on behalf of Mr. Harrington.
13. On July 24, 2001, Mr. Cardono's attorney, George Prescott, wrote to the realtor, Mr. Bousquet, Mr. Prescott said that he had been "instructed by Mr. Cardono not to proceed with the preparation of documents" until Mr. Harrington receives fmal ISDS *Page 4 
approval from DEM. "Would you please let me know when that occurs." Both Mr. Harrington and Mr. Cardono received copies of the letter. A true and correct copy of Mr. Prescott's letter is attached as Exhibit 3 to the Agreed Statement. Mr. Harrington never spoke to Mr. Prescott. Mr. Harrington and Mr. Harrington's Father do not allege that Mr. Harrington's Father ever spoke to Mr. Prescott.
14. Qn September 11, 2001, in an email to Mr. Cardono, Mr. Bousquet stated that he had spoken to DEM the previous week. Mr. Bousquet reported that DEM hoped to have a letter out the following week and believed that "we might have to go for a variance for the land because the ledge is so close to the bottom of the leach field." A true and correct copy of this email is attached as Exhibit 4 to the Agreed Statement.
15. In September 2001, Mr. Garrigan submitted a request for a variance to DEM on behalf of Mr. Harrington that Mr. Harrington signed. A true and correct copy of the request for a variance is attached as Exhibit 5 to the Agreed Statement.
16. On October 3, 2001, Mr. Bousquet sent another email to Mr. Cardono, stating that he had spoken to DEM on Monday and should have something back within the next two weeks. Mr. Bousquet also reported that the engineer "is giving this variance a 90% chance of being approved," A true and correct copy of this email is attached as Exhibit 6 to the Agreed Statement.
17. In December 2001, DEM rejected the request for a variance made to DEM by Mr. Garrigan in September 2001 on behalf of Mr. Harrington.
18. Mr. Cardono sent an email to Mr. Bousquet on January 31, 2002, stating that he "need[ed] to know where we stand in the next two weeks." According to Mr. Cardono's hand notes on the email printout, Mr. Cardono received an email from Mr. *Page 5 
Bousquet in response saying that "they" would have some information "shortly." A true and correct copy of Mr. Cardono's January 31, 2002 email with hand written notes is attached as Exhibit 7 to the Agreed Statement.
19. Mr. Cardono spoke to Mr. Bousquet about the Property and Agreement from time to time up until February 2002, but never after that month. After final email exchanges between Mr. Cardono and Mr. Bousquet in February 2002, Mr. Cardono alleges: Mr. Bousquet thereafter failed or refused to return communications from Mr. Cardono. After February 2002, during one of his trips to Rhode Island, Mr. Cardono went to Mr. Bousquet's office. Mr. Bousquet was not in, so Mr. Cardono left Mr, Bousquet a message at his office asking that Mr. Bousquet contact him. Mr. Cardono got no response to the message that he left for Mr. Bousquet and never again heard from or communicated with Mr. Bousquet.
20. After February 2002, during one of his trips to Rhode Island, Mr. Cardono testified that he went to Mr. Harrington's address listed on the Agreement for notices to seek out Mr. Harrington to learn the result of Mr. Harrington's permitting efforts, Mr. Cardono determined that Mr. Harrington no longer resided at the address fisted on the Agreement for notices. Mr. Harrington never provided written notice to Mr. Bousquet or to Mr, Cardono regarding Mr. Harrington's change of address.
21. In April 2002, Mr. Garrigan caused test holes to be drilled and submitted another request for a variance to DEM on behalf of Mr. Harrington.
22. In October 2002, DEM rejected the request for variance made to DEM by Mr. Garrigan in April 2002 on behalf of Mr. Harrington. *Page 6 
23. In or about Spring 2003, Mr. Harrington spoke to engineer John Cook ("Mr. Cook") about his problem securing the necessary approvals for the Property. Mr. Harrington had engaged Mr. Cook with respect to a different piece of property that Mr. Harrington owned. Mr. Harrington testified that Mr. Cook was confident that he could secure the necessary approvals but was busy and would not be able to work on the project for a number of months. Mr. Harrington hired Mr. Cook to perform the necessary work to get ISDS approval and the necessary permits for the Property.
24. Mr. Cook began his work for Mr. Harrington with respect to the Property in January 2004.
25. In February 2004, Mr. Cook submitted a request for test holes to DEM on behalf of Mr. Harrington regarding the Property.
26. In April 2004, Mr. Cook submitted a new application to DEM on behalf of Mr, Harrington regarding the Property,
27. Between the date that DEM rejected Mr. Garrigan's variance application in October 2002 and Mr. Cook's request for test holes made to DEM in February 2004, no one submitted anything to DEM on Mr. Harrington's behalf regarding the Property.
28. In August 2004 Mr. Cardono was contacted by Robert Nault, who expressed interest in the Property on behalf of CVS, Inc. The site of the CVS corporate headquarters in Cumberland, Rhode Island abuts the* Property.
29. In reaction to the inquiry about the Property from Mr. Nault on behalf of CVS, Mr. Cardono contacted Mr, Prescott in August 2004 and learned that DEM had denied Mr. Harrington's application for ISDS approval, *Page 7 
30. Mr. Cardono sent a letter to Mr. Nault on August 23, 2004 offering to sell the Property to CVS for $150,000. A true and correct copy of the letter is attached as Exhibit 8 to the Agreed Statement. Neither Mr. Nault nor CVS ever responded. Mr. Cardono never contacted Mr. Nault or CVS again.
31. On August 19, 2004, Mr. Cook submitted with Mr. Harrington's signature a new ISDS application to DEM on behalf of Mr. Harrington regarding the Property that Mr. Harrington signed. A true and correct copy of the August 2004 ISDS application is attached as Exhibit 9 to the Agreed Statement.
32. On September 14, 2004, DEM rejected the ISDS application made to DEM by Mr. Cook in August 2004 on behalf of Mr. Harrington.
33. On September 24, 2004, Mr. Cook revised and resubmitted the last ISDS application submitted to DEM on behalf of Mr. Harrington regarding the Property.
34. On September 28, 2004, DEM approved the revised and resubmitted ISDS regarding the Property.
35. On or about October 4, 2004, Mr. Cardono learned from Mr. Prescott that Mr. Harrington had received ISDS approval from DEM and wanted to schedule the closing on the Property.
36. Mr. Harrington spoke to Mr. K. Joseph Shekarchi, his attorney, about closing the purchase of the Property, and Mr. Shekarchi wrote to Mr. Cardono about scheduling the closing in a letter dated October 14, 2004. A true and correct copy of the letter is attached as Exhibit 10 to the Agreed Statement. *Page 8 
37. Mr. Cardono refused to close after demand was made in October 2004 because he deemed that Mr. Harrington was in default for having breached the Agreement.
38. After February 2002, no one representing Mr. Harrington contacted either Mr. Cardono or Mr. Prescott regarding the Property until after DEM approved the ISDS permit on September 28, 2004. During this period, neither Mr. Cardono or Mr. Prescott contacted Mr. Harrington, Mr. Harrington's Father, or Mr. Bousquet regarding the Property.
39. During 2002,2003 and 2004, Mr. Harrington testified that Mr. Harrington or Mr. Harrington's Father occasionally spoke to Mr. Bousquet and let him know the status of their permitting efforts regarding the Property.
40. Mr. Harrington and Mr. Harrington's Father cannot recall or testify as to any specific communications that may have occurred with Mr. Bousquet during 2003 or 2004 regarding the Property or permitting efforts. Mr. Harrington and Mr. Harrington's Father cannot recall any specific dates on which they communicated with Mr. Bousquet during 2003 or 2004 regarding the Property or permitting efforts.
41. After execution and delivery of the Agreement, neither Mr. Harrington, Mr. Harrington's Father, or Mr. Cardono ever provided any notice in writing to Mr. Bousquet.
42. After execution and delivery of the Agreement, neither Mr. Harrington nor Mr; Harrington's Father ever provided any notice in writing to Mr. Cardono at Mr; Cardono's designated address until by letter dated October 14, 2004 Mr. Shekarchi *Page 9 
notified Mr. Cardono at Mr. Cardono's designated address that Mr. Harrington wanted to schedule the closing on the Property.
43. Neither Mr. Harrington nor Mr, Harrington's Father are aware of Mr. Bousquet informing Mr. Cardono regarding any permitting efforts occurring after February 2002.
44. Neither Mr. Harrington nor Mr. Harrington's Father are aware of Mr. Bousquet specifically approving or disapproving, on Mr. Cardono's behalf, any permitting efforts occurring after February 2002.
45. Mr. Harrington and Mr. Harrington's Father do not allege that Mr. Bousquet indicated to them that Mr. Cardono approved any permitting efforts occurring after February 2002.
46. Mr. Cardono asserts that until mid-August 2004 he was unaware that any permitting efforts had occurred with respect to the Property after February 2002 and that he never gave any approval of any sort for any permitting efforts made after February 2002.
47. Mr. Harrington testified that he remains ready, willing and able to close on the purchase of the Property.
48. After the execution of the Agreement, neither Mr. Cardono nor Mr. Harrington ever prepared a notice regarding the Agreement or signed a document that changed any of the terms of the Agreement.
49. Mr. Cardono sent a letter dated December 6, 2004 to Mr. Prescott, with a copy to Mr. Shekarchi, notifying Mr. Prescott that his services were no longer required *Page 10 
wife respect to the Property. A true and correct copy of the letter is attached as Exhibit 11 to the Agreed Statement.
50. Mr. Cardoso did not notify Mr. Harrington or Mr, Harrington's Father that the Agreement was no longer la effect or that they should cease efforts to obtain ISDS approval.
51. Mr. Harrington and Mr. Harrington's Father assert that Mr. Bousquet did not notify them that the Agreement was no longer in effect or that they should cease their efforts to obtain ISDS approval.
[1] Given this finding of due diligence, the Court concludes that Buyer did not abandon the P S agreement as alleged by Seller.See Jakober v. E.M. Loew's Capital Theatre, Inc.,107 R.I. 104, 110, 265 A.2d 429, 433 (1970) ("Whether the vendee's equitable title has been extinguished by abandonment depends upon the concurrence of two factors-an intent to abandon together with some act or failure to act which warrants the conclusion that the vendee no longer claims or retains any interest in the subject matter.") In this case, there was no evidence of Buyer's intent to abandon or failure to act.
[2] The Seller did not assert this claim until he made an oral motion at trial.
 Pursuant to Rule 7(b)(1) of the Superior Court Rules of Civil Procedure, "[a]n application to the court for an order shall be by motion . . ., shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought." Rule 6(c) of the Superior Court Rules of Civil Procedure provides that:
 "A written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than 10 days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court."
 Before 1995, only five days notice was required for service of a motion before its hearing date; however, "[e]xperience has taught that 5 days . . . was insufficient time in which to prepare for a hearing on a motion. . . ." Super. R. Civ. P. 6 Advisory Committee Notes. Tucker v. Kittredge, 795 A.2d 1115, 1118 (R.I. 2002).
Considering that Seller did not provide the required written notice to Buyer of his claim for property taxes, the oral motion also is denied on this alternative ground.